# M. H. WALKER REALTY CO. v. AMERICAN SURETY CO. OF NEW YORK.

No. 3768.   Decided September 15, 1922.   Rehearing denied December 15, 1922.   (211 Pac. 998.)

1. CONTRACTS—THIRD PERSON MAY ENFORCE CONTRACT EXECUTED FOR HIS BENEFIT. Whenever a contract shows a clear intent to benefit a third party, whether specifically named or not, such person ordinarily may sue in his own name for enforcement thereof or for benefits arising therefrom.[1]

2. PRINCIPAL AND SURETY—BOND GIVEN TO SECURE CONTRACT CONSTRUED WITH CONTRACT. Where a bond is executed to secure the performance of a contract, the bond and contract must be construed together.[2]

3. CONTRACTS—INTENT OF PARTIES CONSIDERED IN LIGHT OF CONDITIONS EXISTING WHEN CONTRACT WAS ENTERED INTO. To arrive at intent of parties to a contract, its terms must be considered in the light of conditions as they existed at the time the contract was entered into and not in the light of subsequent conditions.

4. PRINCIPAL AND SURETY—INTENT OF PARTIES GATHERED FROM PROVISIONS OF BUILDING AND ELEVATOR CONTRACTS AND BOND. Where

---

[1] *Thompson* v. *Cheeseman*, 15 Utah, 43, 48 Pac. 477; *Montgomery* v. *Rief*, 15 Utah, 495, 50 Pac. 623; *Brown* v. *Markland*, 16 Utah, 360, 52 Pac. 597, 67 Am. St. Rep. 629; *McKay* v. *Ward*, 20 Utah, 149, 57 Pac. 1024, 46 L. R. A. 623; *Cole* v. *Sugar Co.*, 35 Utah, 154, 99 Pac. 681; *Blyth-Fargo Co.* v. *Free*, 46 Utah, 233, 148 Pac. 627; *Christensen* v. *Realty Co.*, 42 Utah, 70, 129 Pac. 412.

[2] *Blyth-Fargo Co.* v. *Free*, 46 Utah, 234, 148 Pac. 427.

a building contract between the owner and a building company provided for installation of elevators, but did not specify the type, and the company contracted with an elevator company for elevators of a particular type and for maintenance and repair thereof, and the building contract by express reference was made a part of the elevator contract which was made a part of the bond for performance of the elevator contract, every material provision of the contracts and bond should be considered to ascertain the meaning and intent of the parties.

5. PRINCIPAL AND SURETY—OWNER OF BUILDING COULD ENFORCE INDEMNITY FOR BREACH OF CONTRACT BETWEEN BUILDING AND ELEVATOR COMPANIES FOR INSTALLATION AND UPKEEP OF ELEVATORS. Where, at the time the contract between a building company and an elevator company for elevators to be constructed in plaintiff's building was executed, it was known and understood that plaintiff was the owner of the site and of the contemplated building, and the elevator company guaranteed installation of a type of elevator capable of performing a certain service and conforming to a standard designated in the elevator contract, and surety company executed its bond guaranteeing faithful performance, and the elevator contract provided that installation and upkeep provisions should be covered by the bond, notwithstanding fact that building company had a right of action on the bond for failure of the elevator company to properly install the elevators, it was within contemplation of the parties that plaintiff had an interest in the performance of the elevator contract and was to be a beneficiary thereof and could enforce indemnity for its breach.

6. PRINCIPAL AND SURETY—OWNER OF BUILDING NOT DEPRIVED OF RIGHT TO ENFORCE CONTRACT BETWEEN ELEVATOR AND BUILDING COMPANIES BECAUSE OF PRECAUTION TAKEN TO BE EXPRESSLY NAMED IN BOND. Where it was within contemplation of the parties to a contract for the installation of elevators and a bond given for its faithful performance that the contract was for the benefit of the building owner, who was a third party beneficiary, the owner could not be deprived of rights under the contract because as a matter of precaution it attempted two years thereafter to make an effort to have it named as a joint obligee with the building company in the bond.

7. LIMITATION OF ACTIONS—ACTION FOR BREACH OF WARRANTY OF ELEVATOR CONTRACT NOT BARRED BY SIX YEARS' STATUTE. Where a contract of May 12, 1912, for the installation of elevators, provided that seller retained title to elevators until accepted and paid for, an action for breach of warranty begun November 4,

1919, was not barred by Comp. Laws 1917, § 6466, providing that such an action must be commenced within six years, when the elevators were paid for in January, 1915.

8. LIMITATION OF ACTIONS—STATUTE DOES NOT BEGIN TO RUN UNTIL THERE IS A SALE OF ARTICLE WARRANTED. In action for breach of warranty as to quality, limitations do not begin to run until there is a sale of the article warranted.

9. LIMITATION OF ACTIONS—DATE FOR COMPLETION OF CONTRACT WAS FOR OWNER'S BENEFIT AND NOT SO INFLEXIBLE AS TO START LIMITATIONS. Where a contract for the installation of elevators provided that the work was to be completed on date fixed in the contract but, if the company should fail to complete the work within the agreed time, it would pay a named sum for each day's delay and that title to the elevators should remain in seller until paid for, the date fixed for completion was not so inflexible as to set the statute in operation.

10. APPEAL AND ERROR—PLAINTIFF NOT ESTOPPED FROM ASSERTING IMMATERIALITY OF ISSUE MERELY BECAUSE IT MADE IT AN ISSUE OF FACT IN ITS COMPLAINT. Where, in an action against a surety company on its bond for performance of a contract for installation and upkeep of elevators, plaintiff alleged that when it paid the balance due, it believed that the elevators were a substantial compliance with the contract and it acted in good faith in making payment, it was not estopped from setting up the immateriality of that issue, since it could rely on the warranties made in the contract and expressly averred by the bond and, where it emphasized its position to that effect by requests for instructions, it cannot be contended that it did not raise the question in the court below.

11. PRINCIPAL AND SURETY—CONTRACT CONSTRUED IN FAVOR OF VOLUNTARY SURETY WITHOUT COMPENSATION. In cases of a private or voluntary surety without compensation, the surety is held to be a favorite of the law, and the contract, the performance of which he guarantees, is construed strictly in favor of the surety.

12. PRINCIPAL AND SURETY—CONTRACT CONSTRUED AGAINST SURETY MAKING INSURANCE A BUSINESS. In the case of a surety who makes insurance a business for compensation, the contract, the performance of which he guarantees, is construed strictly against him, doubtful provisions of the contract being construed in favor of the insured.

13. SALES—BUILDING OWNER DID NOT WAIVE RIGHT OF ACTION FOR

BREACH OF WARRANTY IN ELEVATOR CONTRACT BY ACCEPTING ELE-
VATORS WITH KNOWLEDGE OF THEIR DEFECTS. Where, at the time
the owner of a 16-story building accepted and paid for elevators
installed therein, the building was practically filled with ten-
ants, all depending on operation of the elevator system, the
owner's knowledge of defects at the time of acceptance was
not a defense against a breach of warranty that covered both
installation and upkeep for a five-year period.[3]

14. PRINCIPAL AND SURETY—ELEVATOR CONTRACT, PROVIDING THAT NO
PAYMENTS MADE THEREUNDER WERE ADMISSION THAT CONTRACT
HAD BEEN COMPLIED WITH, CONSTRUED AS RESPECTS SURETY'S
RIGHTS. Where a contract for the installation of elevators pro-
vided that, if subcontractor fulfilled it, the contractor would
pay him named sum for all work and material in place complete
and accepted by an architect, but, if payment should be made
and the work proved to be substantially defective and not ac-
cording to contract, such payment should not be taken as an
admission that the contract had been complied with if the fact
were otherwise, nor should such condition preclude a right of
action, the stipulations were for plaintiff's benefit, and did not
raise an equity in the surety company guaranteeing perform-
ance in the fund created.

15. PRINCIPAL AND SURETY—PAYMENT FOR ELEVATORS AFTER REFUSAL
OF SURETY TO CONSENT NOT A DISCHARGE OF SURETY. Where, by
the terms of a contract for the installation of elevators, the
owner could make payments without them operating as an ad-
mission that any part of the contract had been complied with
in case that fact should be otherwise before completion, the
owner did not lose the benefit of this safeguard merely because
at one stage of the work it sought the consent of the surety
company to make a payment on the work, which consent was
refused, and afterwards the owner, without the knowledge or
consent of the surety company, paid for the work, although it
was no more complete than when consent for payment was
refused.

16. PRINCIPAL AND SURETY—SURETY BOUND TO KEEP INFORMED OF
FINANCIAL CONDITION OF PRINCIPAL DURING CONTINUANCE OF
WORK. Where surety company executed its bond for the per-
formance of a contract of installation and upkeep of elevators,

the obligee owed no duty to the surety to keep it informed as to the financial condition of the contractor, it being to the interest of the surety, from the time of the execution of the bond insuring performance of the contract, to know the financial condition of its principal and keep informed in that respect throughout the continuance of the work.

17. PRINCIPAL AND SURETY—CHANGE OF CONTRACT, WHERE PROVIDED FOR BY SURETY'S CONTRACT, DOES NOT RELEASE SURETY.  Changes and alterations in elevator installation contract did not release the surety thereon, where the contract expressly provided that changes should not release the surety.

18. PRINCIPAL AND SURETY—CHANGES NOT INJURIOUS TO SURETY DID NOT RELEASE IT.  Changes and alterations in an elevator installation contract did not release surety, where they worked no injury to the surety.

19. APPEAL AND ERROR—ON APPEAL IN LAW ACTION, SUPREME COURT CANNOT DIRECT VERDICT IF FACT QUESTION SHOULD BE DETERMINED BY TRIAL COURT.  In a law action, the Supreme Court is without power to direct a verdict, if there is any question of fact that should be determined by the trial court.

20. APPEAL AND ERROR—WHERE ONLY ISSUE OF FACT SUBMITTED WAS IMMATERIAL, SUPREME COURT MAY DIRECT VERDICT.  Where in an action on a surety bond for performance of a contract for installation of elevators, the breaches and amount of damages were admitted by defendant, and under the pleadings there was no issue of fact submitted to the jury except the question of plaintiff's knowledge that the contract had not been performed when it made the final payment, which issue was immaterial, and the affirmative issues raised by defendant's answer were determined as questions of law, there were no questions of fact to be tried in the court below, and the Supreme Court could direct a verdict.

Appeal from District Court, Third District, Salt Lake County; *M. L. Ritchie*, Judge.

Action by M. H. Walker Realty Company against the American Surety Company of New York.  From a judgment for defendant, plaintiff appeals.

REVERSED with directions to enter judgment for plaintiff.

*T. Ellis Browne, Booth, Lee, Badger & Rich,* and *Van Cott, Riter & Farnsworth,* all of Salt Lake City, for appellant.

*Cheney, Jensen, Holman & Stephens,* of Salt Lake City, for respondent.

THURMAN, J.

Plaintiff brought this action to recover the penalty of a bond executed by the defendant to insure the performance of a contract to install and keep in repair certain elevators in the Walker Bank building, Salt Lake City, Utah. The case was tried upon plaintiff's second amended complaint, defendant's answer thereto, and plaintiff's reply.

Before attempting to state the issues, we will briefly refer to some of the important features of the case. On October 28, 1911, plaintiff entered into a written contract with James Stewart & Co. of New York (hereinafter called the building company) for the construction of a bank and office building in Salt Lake City. Thereafter, on May 24, 1912, the building company entered into a written contract with the Van Emon Elevator Company of San Francisco (hereinafter called the elevator company), as subcontractors, for the installation of an elevator system in said building. The term "contract," as hereinafter used means the elevator contract above referred to unless otherwise stated. The American Surety Company (hereinafter called defendant), as surety for the elevator company, executed its bond for the faithful performance of said contract to the extent of the contract price, to wit, the sum of $30,000. Certain changes in the type of elevator contracted for were authorized in June and November of 1912 by the contracting parties, with the knowledge and consent of defendant. The "4 worm traction elevators" contracted for were changed to "3 standard gearless one to one traction elevators and 1 two to one traction elevator for safe-lifting purposes."

The first elevators were installed and commenced operation in the latter part of 1912. Difficulty in their operation was

encountered at the very beginning. In 1913 a second set was installed, which also proved inefficient and unsatisfactory. Finally, in the summer of 1914, a third set was installed which the elevator company claimed was a substantial compliance with the contract. It demanded an acceptance by the architect and payment of the balance due, amounting to $20,000, $10,000 having been theretofore paid. On January 14, 1915, the architect gave to the elevator company his written acceptance, whereupon the plaintiff paid the building company, and the building company paid the elevator company the amount demanded—$20,000. Thereafter, the elevators still proving inefficient and unsatisfactory, the plaintiff, in 1916, removed them from the building and substituted others instead at an expense of more than the contract price. Plaintiff made demand upon defendant for the indemnity, which demand the defendant refused.

This action was commenced November 4, 1919. It is not necessary to state in detail the proceedings in court prior to filing the second amended complaint, upon which the case was finally tried. For convenience the second amended complaint will hereinafter be referred to as the "complaint." The complaint consists of two causes of action, in the first of which plaintiff sues in its own right. In the second it sues as assignee of the building company. The facts relied on in each cause of action are identical. One statement of the facts will suffice for both.

The pleadings are voluminous. We will not attempt to state their substance in consecutive order, but will, in proper connection, refer to such as are deemed material.

The causes of action are predicated upon breaches of the elevator contract in various respects, and especially in regard to the warranties above referred to. The warranties are expressed in subdivisions XXIV, XXV, and XXVI of the contract, but, in view of the contentions made several other provisions appear to be material to the issues involved. Omitting such provisions are are immaterial, we quote the following subdivisions of the contract:

"Know all men by these presents: That whereas, on the 28th

day of October, 1911, the undersigned, James Stewart & Co., and M. H. Walker Realty Company entered into a certain contract in writing, whereby the said James Stewart & Co. undertook to furnish certain work and material required in the erection of a bank and office building, corner Second South and Main Streets, Salt Lake, known as the Walker Bank building, in accordance with the plans and specifications prepared by Eames & Young (hereinafter referred to as the architect) and referred to in said contract and made a part thereof, and whereas, James Stewart & Co. has engaged with Van Emon Elevator Company, a corporation existing under the laws of the state of California, to furnish the portion of said material hereinafter set forth:

"Now, therefore, this agreement made and entered into this 24th day of May, 1912, in the city of Salt Lake, by and between James Stewart & Co., party of the first part, hereinafter referred to as the contractor, and Van Emon Elevator Company, party of the second part, hereafter referred to as the subcontractor witnesseth:

"I. That the subcontractor, its heirs, administrators, successors, or assigns, in consideration of the covenants and agreements hereinafter entered into by the contractor, hereby covenants and agrees to and with the contractor, that it will well and sufficiently furnish and provide all work and materials necessary or required to fully do, perform, and complete, and will completely furnish in place, four worm-gear traction electric passenger elevators, in accordance with specifications hereto attached; all in a good and workmanlike manner, in accordance with the plans and specifications referred to as a part of the first-mentioned contract, which, together with the general conditions of the specifications, are made a part of this contract; which plans, specifications and the site, have been examined by the subcontractor prior to the execution of this contract; the subcontractor hereby covenants and agrees to provide, at its own expense, all material of every kind of good and sound quality, and all tools, tackle, implements, scaffolding, and machinery of every sort which may be necessary to properly execute this contract and perform and furnish all other materials and things necessary or usual in the premises, and finish the said work in a good, substantial, and workmanlike manner, fully complete and perfect in every respect, to the satisfaction of the architect and contractor, on or before the 1st day of September, 1912, * * *"

IV (in part). "The contractor may at any time during the progress of the work require any deviation from, addition to or omission in the specifications and plans, without giving notice to the surety and the subcontractor agrees to make such changes as a part of this contract, and such change or changes shall in no manner impair, affect or avoid this agreement, and this clause shall be construed without any limitations or restrictions whatsoever as

to extent or character of such changes, omissions or additions."

X (in part). "The subcontractor agrees to fully do and perform this work and in all things execute and complete this contract within the time above limited for that purpose or within said term as it may be extended by reason of delays, changes, additions or other reasons caused or allowed by the contractor or architect, and should such subcontractor fail to complete the work, or deliver its material within the time agreed upon, the subcontractor agrees to pay and will pay to the contractor for each and every day of such delay beyond the time of completion of work or delivery of material as above defined the sum of seventy-five dollars ($75.00)."

"XI. Immediately upon the execution of this contract the subcontractor shall and will furnish the contractor with a bond made by the subcontractor as principal and a surety company as surety, both the form of the bond and the surety company to be satisfactory in every respect to the contractor, in the sum of thirty thousand dollars ($30,000.00) conditioned that the subcontractor will perform all terms and covenants of this contract, and will immediately pay to the contractor all expenses incurred by, or judgments entered against, the contractor, by reason of any injuries to persons or property caused as set forth in article V of this agreement.

"XII. The contractor agrees that, if the subcontractor shall well and faithfully fulfill this contract to the satisfaction of said architect, and keep every covenant on its part herein contained, then the contractor will pay to the subcontractor the sum of thirty thousand dollars ($30,000.00) for all this work and material in place complete and accepted by the architect under this contract.

"No payment made under this contract shall operate as an admission, on the part of the contractor or the architect that this contract or any part thereof has been complied with, in case the fact shall be otherwise, or so as to preclude any action for damages against the subcontractor, should the work and materials hereby required not be performed and furnished in a substantial and workmanlike manner, and of proper quality, or should this contract not be faithfully executed in every respect, or should the work so furnished and installed by the said subcontractor not meet with the written acceptance and approval of the architect. * * *

"XXI. A copy of the proposition submitted by the subcontractor is attached hereto, and the work is to be furnished in accordance therewith, except where the proposition may conflict with some portion of this contract, in which case this contract is to govern.

"XXII. The subcontractor agrees to supervise the operation of these elevators for a period of 90 days after their acceptance by the architects as part of the work required under this contract, if the owners require it to do so.

"XXIII. Payments to be made as follows: On or about the 20th

of the month after acceptance of the complete elevator installations by the architects, 50 per cent. of the amount of this contract. The remaining 50 per cent. within 60 days thereafter.

"XXIV.  The specifications hereto attached have been prepared by the subcontractor who guarantees that same covers all materials and labor required for the complete installation of the elevators herein contracted for, and it is further understood that this installation is guaranteed to equal in operation the Otis No. 17 gearless one to one traction elevators of the latest type, as to ease of stopping and starting, steady motion, economy of power and durability at the specified speeds, and includes the furnishing of all modern safety appliances equal to those used by the Otis Company in the latest installations of gearless traction elevators.

"XXV.  The subcontractor agrees that this contract includes everything necessary and requisite to the proper and efficient operation of the apparatus covered by this contract, and further includes the furnishing and maintenance in Salt Lake City of a full supply of repair parts, and further agrees to have available in Salt Lake City a competent elevator engineer for a period of five years after acceptance by the architects, for the purpose of making all repairs and replacements promptly; and the subcontractor agrees to make all repairs and replacements promptly, free of charge, during this period, provided such are not due to the improper operation of the apparatus included in this contract. The subcontractor further agrees to leave the apparatus in perfect condition and running order at the end of that time.

"It being further understood and agreed that in case the Van Emon Elevator Company, Inc., should change hands on or before the expiration of the period of this guarantee, the obligations, guarantees, and maintenance requirements of this contract are hereby automatically transferred to the heirs, assigns, or purchasers of the Van Emon Elevator Company, Inc., for an additional period of five years, making the maintenance and guarantees cover ten years period instead of five years.

"XXVI.  It is understood that the surety bond required under article XI of this contract, covers all of the provisions of this contract and especially the provisions of articles XXIV and XXV of this contract."

"XXVIII.  It is further understood that the installation of these elevators is to be the best of their respective kind, and where the specifications do not otherwise provide, the work done and materials furnished shall be in accordance with the best practice known to the trade."

The bond given by defendant as provided in subdivision XI of the contract reads as follows:

"Bond to James Stewart & Co.

"Know all men by these presents:    That Van Emon Elevator Company, a corporation existing under the laws of the state of California, as principal, and the American Surety Company of New York, a corporation organized and existing under the laws of the state of New York, as surety, are held and firmly bound unto the co-partnership firm of James Stewart & Co. (contractors) in the sum of thirty thousand and 00/100 dollars ($30,000.00) lawful money of the United States of America, to be paid to the said James Stewart & Co., their certain attorney, executors, administrators, successors, or assigns; to which payment well and truly to be made and done, the said principal and said surety bind themselves and each of them, their and each of their heirs, executors, administrators, and successors jointly and severally, firmly by these presents.

"Sealed with the seal of said principal and with the seal of the said surety and dated this 29th day of May, A. D. 1912.

"Whereas, said principal has entered into a certain written contract, bearing date the 24th day of May, A. D. 1912, with said James Stewart & Co. for the performance of certain work and the furnishing of certain materials in connection with the building of a bank and office building corner Second South and Main Streets, Salt Lake City, Utah, known as the Walker Bank building, which contract, together with all of its terms, covenants, conditions, specifications, and stipulations, is incorporated herein and made a part hereof as fully and amply to all intents and purposes as if said contract was recited at length herein.    It being agreed that any deviations from, additions to, or omissions in, the contract, specifications, or plans of work, required by the said James Stewart & Co., may be made from time to time during the progress of the work, and as often as required, and such change or changes may be made without the consent or knowledge of the surety, and without in any wise releasing them or any of them from liability under this present bond:

"Now, therefore, the condition of this obligation is such, that if the said principal shall well, truly, and faithfully keep and perform the above-mentioned contract, together with all of its terms, covenants, conditions, specifications, and stipulations on their part to be kept and performed according to the tenor and effect thereof, and shall keep harmless and protect the said James Stewart & Co. from and against all loss by reason of the nonperformance or non-fulfillment by the said principal of the terms, covenants, conditions, specifications, and stipulations contained in said contract, to be kept and performed by the said principal as aforesaid; and also against actual loss by reason of any and all delays, claims, defects, errors, obligations, liens, or incumbrances arising from nonperformance or nonfulfillment by said principal, then this obligation to be

null and void, otherwise to be and remain in full force and virtue."

It is alleged in the complaint that the bond was executed for the benefit of plaintiff as well as for the benefit of the building company.

The warranties contained in the contract as shown in the subdivisions above set forth, together with the breaches thereof, constitute the basis of plaintiff's cause of action as stated in the complaint. The proposition referred to in subdivision XXI is the proposition of the elevator company to the building company in which, among other things, it stipulated that the elevators would lift a load of 2,500 pounds at a speed of 500 feet per minute, with a constant pressure at the motor of 220 volts direct current. By subdivision XXI this proposition was made part of the contract.

It is unnecessary to state at length the allegations of the complaint in respect to the breaches of the contract. It is sufficient to say in that regard that the defendant admits in its answer and orally admitted at the trial that the contract was breached by the elevator company, and also admitted that not only was the contract breached but that plaintiff was damaged thereby to the extent of the amount prayed for in its complaint.

After enumerating various troubles and difficulties encountered during 1913 and the early part of 1914 in trying to operate the elevators installed by the elevator company, the complaint, in substance, alleges that during the summer of 1914, after the motors of the elevators had been rebuilt and new adjustments made, and after the elevator company had assured the building company and the plaintiff that all troubles, delinquencies, and defects which had theretofore existed in the elevators had been entirely overcome, and that the installation was in strict compliance with the contract, the elevator company demanded an acceptance thereof as being in substantial compliance with the contract, and also demanded that it be paid the unpaid portion of the contract price therefor, to wit, the sum of $20,000; that the said architect, on January 14, 1915, acting in good faith and believing that the elevators were in substantial compliance with the terms of

the contract, gave his written acceptance of the elevator installations; that plaintiff, in good faith believing said representations of the elevator company and relying upon its assurances and the written acceptance of the architect that the elevator installation was in substantial compliance with the terms of the contract, and not otherwise, paid the balance of said contract price to the building company; that said building company in good faith, believing said representations of the elevator company and relying upon said assurances and the acceptance of said architect, paid to the elevator company the balance of said price, to wit, the said sum of $20,000.

It is then alleged in the complaint that, shortly after said acceptance and the payment of the balance due to the elevator company, the elevators began to show signs of deterioration. Certain defects and delinquencies developed, until finally the elevators became practically valueless for the purposes for which they were constructed and installed. It is then alleged, in substance, that the elevator company refused to make further repairs or replacements and discontinued business in Salt Lake City. The result was that plaintiff, in 1916, found it necessary to remove the elevators from the building and substitute in lieu thereof the Otis elevator of the type mentioned in subdivision XXIV of the contract.

Defendant filed a general demurrer to each cause of action and also a special demurrer on several grounds not necessary to enumerate in this connection. The demurrer was overruled, and defendant filed its answer. By the answer defendant admits the execution of the building contract, the elevator contract and the surety bond. It also admits the alteration of the contract in June and November, 1912, with defendant's knowledge and consent. It admits, in substance, that the elevators were not in substantial compliance with the terms of the contract and that the warranties of the contract were breached by the elevator company as alleged in the complaint. It denies that the plaintiff, its architect, or the building company in good faith believed that the elevators accepted and paid for by them were a substantial compliance with the contract, but on the contrary alleges, in effect, that plaintiff,

its architect, and the building company, with full knowledge of all the defects and delinquencies of the elevators, offered for acceptance, negotiated a compromise with the elevator company, and accepted the elevators and paid the price thereof, thereby waiving and abandoning compliance with the contract, at the same time changing and altering the terms thereof, all without the consent or approval of defendant.

Further answering, defendant pleads and relies on the fact that plaintiff, for a good and valuable consideration, released and discharged all its claims and causes of action arising under either the building contract or the elevator contract and thereby canceled and nullified all the terms and conditions of said contracts and the benefits flowing therefrom in any manner accruing to the plaintiff.

Answering plaintiff's second cause of action, which was based entirely on the right of its assignor, the building company, defendant alleges that said building company was paid by the plaintiff more than $30,000 for the installation of said elevators, and that the said building company had suffered no damages whatever in the premises. Defendant also alleges as a further defense that plaintiff and the building company at the time of accepting said elevators and paying the balance of the contract price therefor knew that the elevator company was in an unsound financial condition and was in imminent danger of becoming insolvent, and that by paying said $20,000 defendant would be deprived of all opportunity of protecting and indemnifying itself out of said fund. Defendant also pleads the statute of limitations, Comp. Laws Utah, 1917, § 6466, subd. 2, in bar.

Replying to the defense set up in the answer, to the effect that certain alterations and changes were made in the contract and installation of the elevators without defendant's knowledge and consent, plaintiff alleges that said alterations and changes were expressly authorized by the contract and covered by the surety bond. Further replying to the answer, plaintiff alleges that long after the acceptance of said elevators by the architect and payment therefor to the elevator company, defendant, with full knowledge thereof, demanded and re-

ceived compensation as surety upon said bond for all of the year 1914 and for several months succeeding the acceptance of said elevators, thereby recognizing and asserting that said bond was in full force and effect subsequent to the date of said acceptance and final payment to the elevator company.

Plaintiff further alleged that at no time prior to said acceptance or final payment to the elevator company did plaintiff have knowledge that the elevator company was in an unsound financial condition, but alleges that defendant was cognizant of said condition and also cognizant of the fact that the balance of the purchase price was about to be paid to the elevator company and did not inform plaintiff of said condition.   Plaintiff alleges that, by reason of all of said facts, defendant waived any right it might have to object to the acceptance of, or payment in full for, said elevators.

The foregoing is only a synopsis of the points raised by the pleadings.   Sufficient has been stated to indicate the issues tried in the court below.   The cause was tried to a jury which found for the defendant no cause of action.   Special findings were made on one or more points to which reference will be made hereinafter.

Judgment for defendant was entered on the verdict.   Plaintiff appeals, and assigns numerous errors upon which it relies to reverse the judgment.   Defendant also relies on numerous cross-assignments of error by virtue of which it contends that plaintiff is not entitled to a reversal of the judgment or to have judgment entered in its favor, notwithstanding the merits of the assignments upon which it relies.

The principal errors relied on by appellant relate to certain instructions to the jury and refusal to instruct as requested by appellant.   Appellant also contends it is entitled to the judgment prayed for as matter of law, because of certain admissions and concessions made by defendant appearing upon the record.

Several questions claimed to be of vital importance are raised by defendant's cross-assignment of errors.   If defendant's contention in respect to them is sustained it will not be necessary to proceed further in the case, except to affirm the

judgment. For that reason these questions will be considered first.

Defendant contends that plaintiff is not a proper party before the court, and has no cause of action against the defendant, either in its own right or as assignee of the building company. The question was first raised by demurrer to the complaint. The demurrer was overruled. It was afterwards raised on motion for a directed verdict. The trial court overruled the motion, but afterwards held that plaintiff stated no cause of action as assignee of the building company, but did state a cause of action in its own right.

The first question to be determined is, Did the court err in its conclusion that plaintiff had stated a cause of action in its own right? The question involves the right of a third person, not a party to a contract between other persons, to sue in his own name as a beneficiary of the contract. It is a question which has frequently arisen in court and the decisions have not always been harmonious. This much, however, can be said with reasonable assurance: That whenever it appears from a contract that there is a clear intent to benefit a third party, whether specifically named in the contract or not, such person, ordinarily, .may sue in his own name for the enforcement thereof or for the benefits arising therefrom. This general proposition, we believe, is well sustained by the great preponderance of judicial opinion in the several states of the Union.

This court has had occasion to pass upon the question in one form or another in numerous decisions heretofore rendered. Appellant calls our attention to the following Utah cases: *Thompson* v. *Cheesman,* 15 Utah, 43, 48 Pac. 477; *Montgomery* v. *Rief et al.,* 15 Utah, 495, 50 Pac. 623; *Brown* v. *Markland,* 16 Utah, 360, 52 Pac. 597, 67 Am. St. Rep. 629; *McKay* v. *Ward,* 20 Utah, 149, 57 Pac. 1024, 46 L. R. A. 623; *Cole* v. *Sugar Co.,* 35 Utah, 154, 99 Pac. 681. See, also, *Blythe-Fargo Co.* v. *Free et al.,* 46 Utah, 234, 148 Pac. 427; *Christensen et al.* v. *Realty Co. et al.,* 42 Utah, 70, 129 Pac. 412.

Appellant also cites many decisions from other jurisdic-

tions, among which are the following:  *Whitehead* v. *Burgess,*
61 N. J. Law, 75, 38 Atl. 802; *Tweedale* v. *Tweedale,* 116 Wis.
517, 93 N. W. 440, 61 L. R. A. 509, 96 Am. St. Rep. 1003;
*Smith et al.* v. *Pfluges,* 126 Wis. 253, 105 N. W. 476, 2 L. R.
A. (N. S.) 783, 110 Am. St. Rep. 911; *Jenkins* v. *Chesapeake
& Ohio Ry. Co.,* 61 W. Va. 597, 57 S. E. 48, 49 L. R.
A. (N. S.) 1166, 11 Ann. Cas. 967.  Authorities are          2
also cited by appellant to the effect that where a bond
is executed to secure the performance of a contract the bond
and contract must be construed together.  We assume that
this doctrine will be accepted as elementary.  It is recognized
by this court in the *Blythe-Fargo* Case, supra.  It is unneces-
sary to cite other cases.

Defendant does not dissent from the doctrine of the cases
above enumerated, but insists they are not applicable to the
case at bar.  It quotes, with approval, the following excerpt
from Elliott on Contracts, § 1413:

"It is a rule of practically universal application that there must
exist on the part of the original parties to the contract a clear intent
to benefit the third party.  Many of the cases in addition to holding
that there must be an intent to benefit the third party, place a fur-
ther limitation on the rule to the effect that the promisee must owe
some obligation to the third party."

Defendant also cites note 47 to the section from Elliott last
referred to, in which the author quotes from *Montgomery* v.
*Rief,* supra, at page 501 of 15 Utah, at page 625 of 50 Pac.,
the following language:

"To entitle a third party, who may be benefited by the perform-
ance of a contract, to sue, there must have been an intention on the
part of the contracting parties to secure some direct benefit to him,
or there must be some privity and some obligation or duty from the
promisor to the third party, which will enable him to enforce the
contract, or some equitable claim to the benefit resulting from the
promise or the performance of the contract, and there must be some
legal right on the part of the third party to adopt and claim the
benefit of the promise or contract."

We feel justified in assuming that the doctrine enunciated
in the excerpts above quoted is the doctrine upon which de-
fendant relies, and that defendant's contention, in the last
analysis, is that the instant case does not come within the doc-

trine therein announced. If we are right in our assumption, no injustice can be done defendant if we consider the facts and conditions of the instant case and the relation of the parties therein, and apply to them the doctrine which defendant itself has invoked.

The rule heretofore referred to as elementary, to the effect that in a case of this kind the bond and contract must be construed together, is not challenged in this proceeding. The court also indorses as correct the proposition advanced by defendant to the effect that, in order to arrive at the intent of the parties to a contract, we must consider its terms in the light of conditions as they existed at the time the contract was entered into and not in the light of subsequent conditions, which perhaps were not within the contemplation of the parties when they executed the contract. We believe this rule is likewise elementary except in cases where public interests are involved, in which case the parties are presumed to contract in contemplation of the power of the state to modify or abrogate the contract entirely, if necessary for the public welfare by reason of changed conditions. Starting with these recognized rules of construction in cases of this kind, we will briefly consider such provisions of the contract and bond in question as in our opinion are material in arriving at the intent of the parties at the time the contract and bond were executed by the several parties thereto.

The building contract was executed by plaintiff and the building company in October, 1911, and among other things provided for the installation of elevators for service in the building. No special type of elevator was provided for in the building contract. In May, 1912, the building company entered into a contract with the Van Emon Elevator Company for the installation of an elevator system of a particular type and for the maintenance and repair thereof for a definite number of years after the elevators were accepted by the architect of the building. The building contract and its specifications, by express reference, were made part of the elevator contract, and the elevator contract, with its specifications, terms and conditions, was made part of the bond

afterwards executed by defendant. Thus we have before us for the purpose of ascertaining the meaning and intent of the parties three written instruments, the building contract, the elevator contract, and the bond. Every material term or provision of either of these instruments should be   4 considered for the purpose of ascertaining the meaning and intent of the parties who executed the contracts.

It was known and understood that plaintiff was the owner of the building site and to be the owner of the contemplated building. There can be no question as to that. The elevators were to be constructed for service in the building and consequently for the benefit of the plaintiff, the owner thereof. With these facts and conditions before the parties the elevator company guaranteed the installation of a certain type of elevator capable of performing certain service and conformable to a certain standard expressly designated in the elevator contract. The defendant, engaged in the business of insurance, executed its bond guaranteeing the faithful performance of the contract. The elevator contract not only guaranteed the installation of a certain type of elevator of designated capacity as described in subdivision XXIV of the contract heretofore quoted, but it likewise guaranteed in subdivision XXV to have available in Salt Lake City a competent elevator engineer, for a period of five years after the elevators were accepted by the architect, for the purpose of making all repairs and replacements promptly, free of charge during said period, except as provided in the same subdivision of the contract. Subdivision XXVI of the contract expressly provides that subdivision XXIV and subdivision XXV just referred to must be covered by the bond, and they are covered by the bond just the same as if they were quoted therein at length.

The question therefore is, What was the intention of the parties to the elevator contract and the bond when they subscribed their signatures thereto? Defendant contends that the building company alone had a right of action because it was the only party with whom the defendant contracted. But this does not determine the question. The vital question is,

Was it within the contemplation of the parties to the contract that plaintiff had an interest in its performance, and was to be a beneficiary thereof? The building company's contract was to end with the acceptance by the architect and payment in full. There was no express warranty by the building company that would survive the architect's acceptance, and, as it had no further interest or concern respecting the business after acceptance by the architect, upon what theory can it be contended that the building company could enforce indemnity for the breach of subdivision XXV relating to maintenance, repairs, replacements, and furnishing a competent engineer for a period of five years after its connection with the business had ceased to exist? It must have been within the contemplation of the parties to the contract at the time it was entered into that the plaintiff could at least enforce indemnity for such provisions of the contract as were manifestly intended for its sole benefit and which could not be enforced by any one else. To deny this right to the plaintiff and to contend that no such right was intended when the contract was entered into, in the opinion of the writer, is to entirely ignore and disregard the very doctrine which defendant has invoked, and which appears to be supported by an overwhelming preponderance of authority.

Defendant's counsel evidently appreciate the force of this contention, for at various stages of their exceedingly able discussion of the question they seek to avoid its effect by contending that the provisions of subdivision XXV of the contract are not involved; that the action is solely for the breach of subdivision XXIV and the stipulation as to speed, lifting capacity, etc., referred to in subdivision XXI. In other words, we understand defendant's contention to be that this action was brought solely for the purpose of recovering indemnity for the failure of the elevator company to install the kind of elevators covered by the warranties and not to recover indemnity for other breaches of the contract. Referring to plaintiff's complaint as the sole standard from which to determine the nature of plaintiff's action and the purpose for which it was instituted, we find no foundation for defend-

ant's contention that the action was not brought to recover indemnity for the breach of subdivision XXV as well as for the breach of subdivision XXIV. The complaint certainly alleges substantial damages for the refusal to make repairs and replacements, and for failure to furnish an engineer and a place in Salt Lake City where supplies could be obtained during the time plaintiff was trying to operate the elevators after acceptance thereof by the architect. The attempt to segregate these damages from damages resulting from failure to install the kind of elevators required by the contract appears to be entirely without reasonable justification.

We have made special reference to plaintiff's undoubted right to sue in its own name for a breach of subdivision XXV, solely for the reason that no one but the plaintiff was beneficially interested in any sense whatever in the covenants contained in said subdivision. There can be no reasonable doubt, when the contract was entered into, as to the intention of the parties concerning plaintiff's interest therein and its right, if need be, to protect that interest by action in its own name and in its own right

If plaintiff had an undoubted right to bring an action to recover indemnity for a breach of subdivision XXV, can it be successfully contended that its right ceased at that point and that, as to other breaches of the contract, the building company alone could sue? The truth is, as we read the several contracts involved, the plaintiff had just as much interest and just as much concern in the faithful performance of the covenants and warranties in subdivision XXIV as it had in those of subdivision XXV. The only possible difference the writer can see is that, as to a breach of the latter subdivision, the plaintiff alone could sue, while, as to the former, the building company also had the right to sue. It had the right, first, because it was one of the contracting parties and, second, because it was entitled to a commission on the cost of the installation. That must have been within the contemplation of the parties to the contract at the time of its execution, and that is the standard by which to determine its meaning and

intent. As conditions existed then, it could be clearly seen that no one but the plaintiff could have any possible interest in the provisions of subdivision XXV, and at that time it could also be seen that after the work was accepted and the building company settled with, no one but the plaintiff could have any possible interest in the covenants and warranties of subdivision XXIV. As to whether plaintiff had a right to settle with the building company and release it, and the building company settle with the elevator company, and whether defendant was thereby released, these questions will be considered hereinafter in their proper connection.

As suggested by plaintiff's counsel, it is not at all clear, when the provisions of these contracts are considered, that the third party doctrine is in any manner involved. The building company supervised the construction of the building on a cost plus basis. It received a commission for the supervision at a fixed per cent. of the cost. It made no express warranty which would survive acceptance, and the nature of its real relationship to the plaintiff approximates more closely to that of an agent than anything else. As to this, however, we make no decision. The question can well be determined on the third party doctrine.

Counsel for defendant, during the course of their argument, made a suggestion to the effect that, if the elevator company, after entering into the contract, had not attempted to install the elevators at all, and the building company had been compelled to install them at an increased price, the building company alone would have had a right of action to recover the difference. There is reason for grave doubt concerning this contention. The specifications of the building contract show that the sum of $35,000 was allowed the building company for the installation of the elevators, with the understanding that if they cost less than that amount the difference was to be retained by plaintiff and if they cost more the difference was to be paid to the building company. Under this kind of an arrangement we do not see how it can be seriously contended that the building company would have the sole right of action.

Everything considered in connection with the contract and its specifications at the time it was entered into, there seems to have been a clear intent in the minds of the parties thereto to benefit the plaintiff to the extent that plaintiff should have an undoubted right to maintain an action for a breach of the contract.

We confess our inability to follow the argument of defendant's able counsel or comprehend the subtle refinements in which they indulge in respect to plaintiff's release and discharge of the building company. It is insisted by defendant that by releasing any cause of action it might have had against the building company it thereby released the defendant as to any cause of action plaintiff might have in its own right. That would probably be true if plaintiff's cause of action in its own right depended entirely upon some obligation owed to the plaintiff by the building company. We have however, endeavored to make our position understood to the effect that the contract between the parties discloses a clear intent on their part to benefit the plaintiff, and plaintiff's relation to the subject-matter of the contract, and its interest therein was well known to the parties when they attached their signatures thereto.

In arriving at the above conclusion we have not overlooked defendant's contention that the plaintiff itself, by its own acts and conduct, interpreted the contract to mean the same as defendant now contends. Defendant, in support of this contention, quotes a resolution of the plaintiff's board of directors passed in September, 1914, to the effect that the manager and attorney of plaintiff be instructed to make an effort to have plaintiff named as joint obligee with the building company in the bond executed by defendant. The point sought to be made by defendant is that plaintiff at that time understood it was not a party to the bond unless it was expressly named therein. Defendant insists that because of this so-called interpretation by plaintiff of the meaning and intent of the bond plaintiff cannot consistently contend that it has a direct right of action as a third party beneficiary.

We have already considered the meaning and intent of the

contract and bond as understood by the parties thereto at the time of their execution. We have no reasonable doubt as to the correctness of our interpretation. We see no reason for changing our opinion as to the meaning and intent of the parties when the contract was made, merely because the plaintiff, more than two years afterwards, expressed a desire to have it made more specific as to the plaintiff's interest therein. Plaintiff was already a third party beneficiary. What plaintiff, by the resolution referred to, apparently desired was to be expressly named in the bond so as to avoid the very contention which defendant now makes. If plaintiff has a right under the contract and bond as written, it certainly should not be deprived of that right merely because, as a matter of precaution, it desired to have the right made more specific and clear.

The trial court did not err in denying defendant's motion for a directed verdict as far as plaihtiff's cause of action in its own right was concerned.

Defendant also cross-assigns as error the ruling of the trial court overruling its demurrer and denying its motion for a directed verdict on its plea of the statute of limitations, Comp. Laws Utah 1917, § 6466, providing that such an action must be commenced within six years.

The action was not commenced until November 4, 1919. Defendant contends that by failing to complete the work by September 1, 1912, as provided in the contract, the contract was thereby breached and the statute began to run. On the other hand, plaintiff contends that the statute would not begin to run until the work was accepted January 15, 1915. Defendant takes the position that the bond in suit is one of guaranty as well as indemnity, and that with respect to guaranty the right of action begins when the breach occurs. Counsel for defendant, upon this point, cite the following cases: *Lowenthal* v. *McElroy,* 181 Mo. App. 399, 168 S. W. 813; *Equitable Trust Co.* v. *Surety Co.,* 214 Pa. 159, 63 Atl. 697, 6 Ann. Cas. 465; *Ex parte Negus,* 7 Wend. (N. Y.) 499; *Rawleigh Med. Co.* v. *Atwater,* 33 Idaho, 399, 195 Pac. 545; *Aachen* v. *Morton,* 156 Fed. 657, 84 C. C. A. 366, 15 L. R. A.

(N. S.) 156, 13 Ann. Cas. 692, and note. These cases un-, doubtedly support the contention that in an action to recover for the breach of a contract the statute ordinarily begins to run when the breach occurs and not when the damage is ascertained. If the action in the instant case had been for a breach of the contract for failure to complete the work by September 1, 1912, as provided in the contract, the plea of the six-year limitation statute would probably have been a good defense, but this is not an action to recover damages for delay in the performance of the contract, but for breach of warranties contained in subdivisions XXIV and XXV thereof. As we understand the rule, in an action for breach of warranty as to quality the statute does not begin to run until there is a sale of the article warranted. In this case there was no sale or transfer of the title to the elevators until they were accepted and paid for in January,        7, 8 1915. The contract expressly provides that the elevator company shall retain title until the elevators are accepted and paid for. See note to case last cited by defendant, 13 Ann. Cas. at page 700, under subhead, "Warranty of Chattels." See, also, *Bancroft* v. *San Francisco Tool Co.*, 5 Cal. Unrep. Cas. 586, 47 Pac. 684, and *Bunday* v. *Columbus M. Co.*, 143 Mich. 10, 106 N. W. at page 398, 5. L. R. A. (N. S.) 475. The cases cited and relied on by defendant confirms this doctrine.

It is not permissible in an opinion of this nature, which is necessarily lengthy, to devote much time and space to a review of the cases cited. We can only cite the cases, declare our conclusion, and let the reader determine for himself whether or not our conclusion is correct.

It is quite clear, when we consider the contract as to the time within which the work was to be completed, that the date fixed was not intended to be inflexible or unalterable, for it appears in subdivision X of the contract that if the elevator company should fail to complete the work within the time agreed upon it would pay to the building company for each and every day of such delay the sum of $75. Furthermore, this feature of the contract renders it practically conclusive

that the provision as to time was inserted solely for
the benefit of the plaintiff and in no sense for the          9
benefit of the defendant.  Besides this, it nowhere ap-
pears in the history of the case that defendant ever com-
plained because of the delay in completing the work on the
date named in the contract.  Neither is it made to appear
that defendant was prejudiced thereby.

In this connection, the case of *Beebe et ux.* v. *Redward et
al.*, 35 Wash. 615, 77 Pac. 1052, cited by appellant, is per-
tinent and to the point.  The action was to recover damages
for the breach of a building contract.  The bond given by the
contractor, among other things, provided:

"* * * That any suits at law or proceedings in equity brought
against this bond to recover any claim hereunder must be insti-
tuted within six months after the first breach of said contract."

The contract also provided that the building should be
completed August 31, 1901, but it was not completed until
four months thereafter.  The surety company defendant
pleaded in bar the limit fixed in the bond, contending that
the building was not completed in time.  The fifth headnote
of the case tersely states the point and the decision of the
court:

"Where an owner of a building elected to waive the contractor's
default in failing to complete the same within the time prescribed,
the contractor's surety was not entitled to claim the benefit of such
default for the purpose of setting in operation a provision of the
bond requiring any action brought thereon to be commenced within
six months after default, in the absence of a showing that the surety
was prejudiced by the contractor's failure to perform within the
time fixed."

An examination of the opinion in that case, at page 1054
of the report, discloses the fact that two points were definitely
decided, both of which are pertinent to the question under
review:  (1)  That the time limit fixed in the bond for the
completion of the building was for the benefit of the owner
and not for the surety;  (2) that, even though a time limit
was fixed in the bond within which action for a breach must
be commenced, still the surety could not plead the limitation
in bar unless it was prejudiced thereby, and as to that ques-

tion it seems the burden of showing prejudice was on the surety. See, also, the following excerpt from the note to *Royal Indemnity Co.* v. *Northern Granite & S. Co.*, 12 A. L. R. at page 390:

"It has been held that the rule of strict construction of an individual surety's contract is not applicable to a surety for hire to the extent that the latter will be relieved of his contract by an extension of time to the principal, and that there will be no presumption that such surety was injured by an extension of time unless such injury is alleged and proved. *United States use of J. B. Van Sciver Co.* v. *United States Fidelity & G. Co.* (1910) 178 Fed. 721. See to the same effect, *United States Fidelity & G. Co.* v. *Golden Pressed & Fire Brick Co.* (*United States Fidelity & G. Co.* v. *United States*) (1903) 191 U. S. 416, 48 L. Ed. 242, 24 Sup. Ct. Rep. 142; *People use of H. Houghton & Sons* v. *Traves* (1915) 188 Mich. 345, 154 N. W. 130; *Standard Salt & Cement Co.* v. *National Surety Co.* (1916) 134 Minn. 121, 158 N. W. 802."

Appellant also relies on authorities to the effect that there may be successive breaches of a bond, the obligee waiving the first, in which case the statute of limitations will not begin to run until later. 32 Cyc. 229; *McKim* v. *Williams*, 134 Mass. 136.

In the opinion of the court, respondent's plea of the statute of limitations was without merit and the ruling of the trial court thereon was without error.

It is further contended by respondent under its cross-assignment of errors that the trial court erred in overruling its motion for a directed verdict for the reason that, at the time of the acceptance of and payment for the elevators, plaintiff and its architect knew or should have known that the elevators were defective in the matters complained of as breaches of the contract, and plaintiff is thereby estopped from prosecuting this action. This contention of defendant, in the opinion of the writer, is by far the most important question presented for our consideration, and, as the right of appellant to be heard in opposition thereto is challenged by defendant, it becomes necessary to first determine whether or not plaintiff has a right to be heard.

As hereinbefore stated, the elevator contract between the building company and elevator company was entered into

May 24, 1912. It provided that the work should be completed by the 1st of September of the same year. The first set of elevators was not installed and put into operation until the December next following. These were unsatisfactory, and a second set was installed during the year 1913. These likewise failed as a fulfillment of the contract, and a third set was installed in the summer and fall of 1914. The elevator company contended that the third set of elevators was a substantial compliance with the terms of the contract, and demanded payment of the balance claimed to be due, which was $20,000.

Considerable disputation occurred between the parties concerning the efficiency of this set of elevators, resulting at last in the architect of the building giving his written acceptance of the elevators, and payment therefor was made on the 15th day of January, 1915. Plaintiff in its complaint, in substance, alleges that when it paid the balance of $20,000 plaintiff and the building company believed from assurances and representations made by the elevator company that the elevator installation was a substantial compliance with the terms of the contract, and acted in good faith in making the final payment. These allegations were denied by defendant in its answer, and, on the contrary, it affirmed that both plaintiff and its architect and also the building company, at the time of the acceptance of said elevators and final payment therefor, knew that the elevators accepted were not a substantial compliance with the terms of the contract in any respect. This became practically the only issue of fact upon which the case was finally submitted to the jury. By special finding, the jury found the issue against the plaintiff.

Appellant makes the contention that it is immaterial as matter of law whether or not plaintiff knew that the elevators were defective and failed to measure up to the terms of the contract, for the reason that plaintiff had the right to rely upon the warranties made in the contract and expressly covered by the surety bond. Respondent insists that, in view of the issue raised by the pleadings and tried by the jury, appellant is now estopped from contending that the issue

was immaterial. Respondent's argument in that regard is plausible but not convincing. If, as matter of law, it was immaterial whether or not plaintiff knew, when it made the final payment for the elevators, that they were not a fulfillment of the contract, we cannot understand why plaintiff should be estopped from asserting the immateriality of the issue merely because it made the matter an issue of fact in its complaint. As far as that question is concerned, it seems to the writer that plaintiff had the right to allege its want of knowledge of the defective condition of the elevators at the time of final payment without losing its right to contend as matter of law that such knowledge was immaterial. In our opinion, it would be carrying the doctrine of estoppel altogether too far to hold that, because a party presents an issue of fact in his pleading, upon which issue he fails at the trial, he is thereby estopped from contending that such issue as matter of law was immaterial. Respondent's counsel have cited no case in support of their contention, and we are of opinion that none can be found. Besides this, plaintiff in numerous requests for instructions to the jury emphasized its position to the effect that knowledge on its part, or on the part of the building company, of defects in the elevators at the time of acceptance and final payment was not a bar to its right to recover from defendant such damages as it may have sustained by reason of the breaches complained of. It cannot, therefore, be contended that appellant did not raise the question in the court below.

A proper consideration of the remaining errors cross-assigned by respondent renders it necessary to interpret the meaning, force, and effect of many of the subdivisions of the contract hereinbefore quoted and the rule of construction applicable thereto. The modern authorities seem to be almost a unit upon the proposition that a different rule of construction applies to different classes of sureties. In the case of a private or voluntary surety without compensation the surety is held to be a favorite of the law, and the contract, the performance of which he guarantees, is construed strictly in favor of the surety. *Strictissimi juris*

is the term used to express the rule by which his liability shall be determined.

In the case of a surety who makes insurance a business for compensation, the rule is exactly the reverse. Doubtful provisions of the contract, the performance of which the surety guarantees, are construed in favor of the insured. The distinction between the two rules and the cases to which they apply are well stated in the following excerpts quoted from 21 R. C. L. under the caption "Principal and Surety." Speaking of the rule applicable to private or voluntary sureties, the author, at page 985, § 28, says:

"Sureties are persons favored by the law. Their obligations are ordinarily assumed without pecuniary compensation, and are not to be extended by implication or construction. Their liability is, as it is put, *strictissimi juris*. They have a right to stand on the terms of their obligation, and, having consented to be bound to a certain extent only, their liability must be found within the terms of that consent, strictly construed. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand on the very terms of his contract, and if he does not assent to any variation of it and a variation is made, it is fatal. And courts of equity, as well as of law, have been in the constant habit of scanning the contracts of sureties with considerable strictness. Where a person gives a bond with sureties conditioned for his faithful performance of a written contract, the sureties will not be liable for the default of their principal to perform any duty or obligation arising out of a contract not fairly within the provisions of the written contract which the bond was given to secure."

In the case of corporate sureties, or sureties for hire, the same author, under the same caption, section 200, states the rule as follows:

"The law of suretyship has undergone a considerable change in late years. The day of personal suretyship is fast slipping away, and in its stead comes corporate surety for profit. Formerly, a surety was an individual, or collection of individuals, actuated by beneficent motives to carry the burden of suretyship, receiving no profit or benefit, and, in consequence thereof, the law dealt tenderly with him or them. But, in this day and age of corporate sureties, the burden is lightened by the payment of adequate premiums and their final liabilities are ofttimes secured by counter indemnity. As a result of this new condition of affairs, the trend of all modern

decisions, federal and state, in the construction of the law appertaining to sureties is‚ to distinguish between individual and corporate suretyship, where the latter is an undertaking for money consideration by a company chartered for the conduct of such business.    In the one case, the rule of *strictissimi juris* prevails, as it always has; that is, the contract of an individual surety, or a 'voluntary surety' as he is spoken of in some cases, will be strictly construed and all doubts and technicalities resolved in favor of the surety, such person being regarded as a favorite of the law.    But in the other case, because it is essentially an insurance against risk, underwritten for a money consideration by a corporation adopting such business for its own profit, the contract will be construed most strongly against the surety and in favor of the indemnity which the obligee has reasonable grounds to expect.    And, in general, as the contracts of surety companies are essentially contracts of indemnity, the courts ordinarily apply to them by analogy the rules of construction applicable to contracts of insurance.    Hence, in an action on a bond written by a surety company, if the bond is fairly open to two constructions, one of which will uphold and the other defeat the claim of the insured, that which is most favorable to the insured will be adopted.    Moreover, the courts generally hold that such a company can be relieved from its obligation for suretyship only where a departure from the contract is shown to be a material variance, or, as it has been otherwise expressively stated, the modern day surety company must show some injury done before it can be absolved from the contracts which it clamors to execute.    For, it has been said, to allow such companies to collect and retain premiums for their services, graded according to the nature and extent of the risk, and then to repudiate their obligations on slight pretexts that have no relation to the risk, would be most unjust and immoral and would be a perversion of the wise and just rules designed for the protection of voluntary sureties.    It has been held, however, that the plain stipulations of the undertaking of a surety company which is paid for undertaking the risk will be enforced in its favor, the same as those of a gratuitous surety."

In the note to *Royal Indemnity Co.* v. *Northern Granite & S. Co.*, 12 A. L. R., heretofore cited, at page 382, the annotator says:

"Except in one jurisdiction, it seems to be well settled that, while the contract of an individual surety, or a voluntary surety, as spoken of in some cases, will be strictly construed and all doubts and technicalities resolved in favor of the surety, such person being regarded as a favorite of the law, this rule does not apply in the case of a company organized for the express purpose of acting as a surety for a compensation.    The courts, with the single exception

noted, agree that in the case of a surety company, acting for com-
pensation, the contract will be construed most strongly against the
surety, and in favor of the indemnity which the obligee has reason-
able grounds to expect. The courts, further, in following this rule,
regard the contract more in the nature of an insúrance contract,
and by analogy apply the rules governing liability applicable in the
latter class of contracts."

Cases are cited from federal courts and more than half
the states of the Union. It is impracticable to make specific
reference to the cases, but the writer has examined one or
more cases from each of the states referred to, as well as cases
decided by the United States Supreme Court, and finds that
the text of the note is amply supported. See, also, note to
*Philadelphia* v. *Fidelity & Deposit Co. of Maryland* (Pa.)
as reported in Ann. Cas. 1912B at page 1087. The cases cited
are too numerous to mention. On the same page, in the same
note, the annotator quotes the following excerpt from the
opinion of the court in *Atlantic Trust, etc., Co.* v. *Laurin-*
*burg,* 163 Fed. 690, 90 C. C. A. 274:

" 'The very reason for the existence of this kind of corporations,
and the strongest argument put forward by them for patronage, is
that the embarrassment and hardship growing out of individual
suretyship that give application for this rule is by them taken
away; that it is their business to take risks and expect losses. If,
with their superior means and facilities, they are to be permitted
to take the risks, but avoid the losses by the rule of *strictissimi*
*juris,* we may expect the courts to be constantly engaged in hearing
their technical objections to contracts prepared by themselves. It
is right, therefore, to say to them that they must show injury done
to them before they can ask to be relieved from the contracts which
they clamor to execute. In this case no injury, but benefit, came to
this defendant from all the changes made, and from the town's
guaranteeing the material order, and advancing the money for the
contracting company to advance and perform the work; and its
exceptions because of these are groundless.' Similarly in *American*
*Surety Co.* v. *Pauly* (1898) 170 U. S. 133, 42 L. Ed. 977, 18 Sup. Ct.
552, the court, in speaking of the construction of a surety company's
bond given by the cashier of a bank, said: 'If, looking at all its
provisions, the bond is fairly and reasonably susceptible of two
constructions, one favorable to the bank and the other favorable to
the surety company, the former, if consistent with the objects for
which the bond was given, must be adopted, and this for the reason
that the instrument which the court is invited to interpret was

drawn by the attorneys, officers or agents of the surety company. This is a well-established rule of the law of insurance.' "

We deem it unnecessary to refer to other authorities in support of the general proposition. The doctrine appears to be established beyond the pale of successful **12** controversy. We have no reason to believe that it is controverted in the case at bar, especially when coupled with the qualification already noted, that—

*"The plain stipulations of the undertaking of a surety company which is paid for undertaking the risk will be enforced in its favor the same as those of a gratuitous surety."* (Italics ours.)

The defendant in this case is a paid surety, and the contract, the performance of which it has undertaken to guarantee, must be construed in accordance with the rule applicable to paid sureties.

This brings us to a consideration of defendant's cross-assignment of errors subhead No. 2, as numbered in its motion for a directed verdict. Under this subhead defendant claims it was entitled to be discharged because, at the time of the acceptance of and payment for the elevators, plaintiff and its architect knew or must have known that the elevators were defective in all the matters complained of by plaintiff as breaches of the contract, and plaintiff is thereby estopped from prosecuting this action. In support of this contention, defendant cites the following cases: *U. S.* v. *Corwine,* Fed. Cas. No. 14871; *U. S.* v. *Tillotson,* Fed. Cas. No. 16524; *McCormick* v. *Kelly,* 28 Minn. 135, 9 N. W. 675; *Morgan County* v. *McRea,* 53 Kan. 358, 36 Pac. 717; *Ind. Dist. of Mason City* v. *Reichard et al.,* 50 Iowa, 98; *Grant* v. *Smith,* 46 N. Y. 93; *Waupaca Elec. Co.* v. *Milwaukee Elec. Co.,* 112 Wis. 469, 88 N. W. 308; *Bethune* v. *Dozier,* 10 Ga. 235; *County of Glenn* v. *Jones,* 146 Cal. 518, 80 Pac. 695, 2 Ann. Cas. 164; *Orleans, etc., R. R.* v. *International Construction Co.,* 113 La. 409, 37 South. 10; *Board of Comm'rs* v. *Branham* (C. C.) 57 Fed. 179, at page 183; *Reissaus* v. *Whites,* 128 Mo. App. 135, 106 S. W. 603; *Stillman* v. *Wickham,* 106 Iowa, 597, 76 N. W. 1008; *Newark* v. *J. Asphalt Co.,* 68 N. J. Law, 458, 53 Atl. 295.

These cases, except one, are individual surety cases and within the rule of *strictissimi juris*. Only two of the cases are in any sense in point upon the question we are now considering. The remaining cases go to the point that material changes in a contract release the sureties. This question will be considered under another subhead. The two cases referred to are *McCormick et al.* v. *Kelly*, 28 Minn. 135, 9 N. W. 675, and *Mayor, etc., of City of Newark* v. *New Jersey Asphalt Co. et al.*, 68 N. J. Law, 458, 53 Atl. 294. In *McCormick* v. *Kelly*, supra, the action was to recover on a promissory note given for the purchase of a harvester. The only defense was a counterclaim for damages for an alleged breach of warranty. Defendant took the machine on trial. It proved unsatisfactory and he notified plaintiff to take it away, whereupon plaintiff promised to put the machine in good order, to furnish new parts, and warranted the machine to be well made, of good material, durable, and not liable to break or get out of order. Other warranties were made, relying upon all of which defendant purchased the machine and gave the note in question. The evidence tended to show that at the time he gave the note defendant knew of the defects of which he complained. The court, after referring to certain conflicting instructions given by the trial court respecting the law of warranties of personal property, said:

"The court erred in these instructions to the jury. It has always been held that a general warranty should not be considered as applying to or giving a cause of action for defects known to the parties at the time of making the warranty, and both the weight of authority and reason authorize this proposition viz.: That, for representations in the terms or form of a warranty of personal property, no action will lie on account of defects actually known and understood by the purchaser at the time of the bargain. *Marjetson* v. *Wright*, 7 Bing. 603; *Dyer* v. *Hargrave*, 10 Ves. Jr. 506; *Schayler* v. *Russ*, 2 Caines' R. 202; *Kenner* v. *Harding*, 85 Ill. 264; *Williams* v. *Ingram*, 21 Tex. 300; *Marshall* v. *Drawhorn*, 27 Ga. 275; *Shewalter* v. *Ford*, 34 Miss. 417; *Brown* v. *Bigelow*, 10 Allen, 242; Story on Cont. § 830; Benj. on Sales (2d Ed.) 502; Chitty on Cont. (11th Am. Ed.) 644."

Assuming that the excerpt just quoted correctly states the law as to warranties of personal property returnable without

sacrifice made at the very time of a completed sale thereof, it would be a harsh rule to apply to a case of this kind where the warranty is made more than two years before the sale is complete, and in the meantime the property has become lawfully attached to and used in connection with the realty in such manner that it cannot be rejected and returned to the owner without greater damage perhaps than the amount sued for by the plaintiff. It appears in this case that, at the time the elevators were accepted and paid for, the building in which they were installed, a 16-story structure, was practically filled, from the lowest to the highest story, with tenants, all depending upon the continuous operation of the elevator system. We cannot believe that the law in such case required the plaintiff to reject the elevators and permit them to be removed from the building in order to preserve its rights under the contract. Besides this, it will be noted that the court, in the excerpt quoted from the opinion in the *McCormick* Case, supra, limits the rule to "defects known at the time of the warranty," which renders it entirely inapplicable to the case at bar.

Reference to a few of the cases cited in the quotation from the *McCormick* Case, supra, will be somewhat illuminating in this connection. In the Texas case the headnote says:

"A general warranty of soundness does not cover defects which are plain and obvious to the purchaser, or which are at the time known to him."

In the Georgia case, the headnote reads:

"Patent defects, to which the attention of the buyer is called, and against which he disclaims all purpose of holding the seller responsible, are not covered by a warranty of soundness."

The fourth headnote in the Mississippi case qualifies the rule as follows:

"The rule, which excludes from a general warranty of soundness, obvious defects, applies to such imperfections only as are plain and palpable, and cannot but be perceived and understood to their full extent by the purchaser; such as the want of a leg, an arm, or an eye, etc. It does not extend to a case where, though the purchaser was aware of the existence of disease, yet its precise character not being obvious to the senses, its extent was uncertain and unknown."

The headnote in the Massachusetts case (10 Allen, 242), pertinent to the question, reads:

"A bill of sale of 'one horse, sound and kind,' is a warranty of soundness, upon which the vendor is liable if the horse proves to be permanently lame, although the purchaser knew that he was lame a week before the sale, and his lameness was talked of before the sale, and the vendor then refused to give a warranty."

These references to the cases relied on by the court as the basis of its opinion in the *McCormick* Case demonstrate conclusively the character of cases to which the rule is applied, and in such cases there ought not to be any doubt as to the soundness of the rule.

The case of *Mayor, etc., of City of Newark* v. *New Jersey Asphalt Co.*, supra, cited by defendant, approximates more nearly to a case in point. The third and fourth paragraphs of the syllabus sufficiently state the nature of the case, the question involved, and the holding of the court:

"In a suit for damages upon a bond given as an indemnity against defective work under a contract with a city for paving a street, a plea in bar which simply alleges that the city has accepted and paid for the work is not good. To be a complete bar to the whole action made by the declaration, it must allege that the plaintiff, the mayor and common council, accepted and paid for said work, before suit brought, with knowledge of the facts alleged as breaches in the declaration. A surety upon a bond thus given can only be released by some positive act done by the plaintiff, to the prejudice of the surety, as acceptance and payment, with knowledge, would be, or some negligent act which will imply connivance amounting to fraud."

The case on its face appears to lend some support to defendant's contention, but the statement of the question is exceedingly meager, there is no discussion, and the building contract, in respect to payments, is radically different from the contract in the instant case. This matter will receive further attention in another connection.

Upon the question under review, appellant calls our attention to the following authorities: Williston on Contracts, § 711, also sections 700-720; Page on Contracts, pp. 5415-5417; *Mining Co.* v. *Supply Co.*, 36 Utah, 121, 103 Pac. 242, 140 Am. St. Rep. 815; *Detroit Heating & L. Co.* v. *Stevens,*

16 Utah, 177, 52 Pac. 379; *Stillwell Mfg. Co.* v. *Phelps,* 130 U. S. 520, 9 Sup. Ct. 601, 32 L. Ed. 1035; *Otis Elevator Co.* v. *Flanders Realty Co.,* 244 Pa. 186, 90 Atl. 624; *Walter* v. *Huggins,* 164 Mo. App. 69, 148 S. W. 148; *Cummings* v. *Pence,* 1 Ind. App. 317, 27 N. E. 631; 2 Wlliston on Contracts, § 724; *Christensen* v. *Hamilton Realty Co.,* 42 Utah, 70, 129 Pac. 412; *Stephens* v. *Doxey,* 58 Utah, 196, 198 Pac. 261; *Leonard* v. *Home Builders,* 174 Cal. 65, 161 Pac. 1151, L. R. A. 1917C, 322; *Cowles* v. *U. S. Fidelity & Guaranty Co.,* 32 Wash. 120, 72 Pac. 1032, 98 Am. St. Rep. 838. See, also, *Flannery* v. *Rohrmayer,* 46 Conn. 558, 33 Am. Rep. 36.

The doctrine of the foregoing cases is more or less in favor of appellant's contention that knowledge of defects at the time of acceptance is not of itself a defense against a warranty, whether express or implied. It is contended that such warranty survives acceptance notwithstanding knowledge of substantial defects in the work to be performed or the material to be furnished. In Page on Contracts, at page 5154, it is said:

"Payment in full with knowledge of defects or taking possession of a building does not of itself waive a right of action for damages."

On pages 5415 and 5416 of the same volume it is said:

"Accepting chattels offered as performance of a contract of sale with warranty either express or implied does not waive the right of action for damages, if the chattels do not correspond to the warranty."

On page 5417, same volume, the author says:

"The justice of the rule that acceptance after breach, even though a waiver of the right to treat such breach as discharge, is not a waiver of a right of action for damages, is especially clear in cases in which the party who is not in default is constrained by his necessities to take what he can get under his contract when he can get it. Such conduct does not and should not operate as a waiver of the right of action for damages."

In *Mining Co.* v. *Supply Co.,* supra, this court recognized the rule that an express warranty of quality can be relied on by a purchaser after acceptance.

In *Detroit Heating & L. Co.* v. *Stevens,* supra, suit was brought for a balance claimed to be due on the sale of a hot

water heater. Defendant counterclaimed for breach of war-. ranty, alleging damages. The trial court found in favor of defendant, and plaintiff appealed. This court reversed the judgment on a question of procedure, but on a question similar to the one involved in the instant case the court, at page 185 (16 Utah) said:

"After making repeated payments upon it, with knowledge of its defects, and after making changes in it, and treating it as his own, and without any expressed intention to rescind the contract until the lapse of three years and seven months, and until the building in which it stood had been burned, the defendant cannot be heard to say he did not accept the heater, and give notice to the plaintiff to take it away, and maintain a suit to recover the price paid. Nor can he rescind the contract. By such conduct he waived his right to rescind, though not his right to sue upon the plaintiff's guaranty for damages in consequence of its breach. Waiver of defendant's right to reject or rescind the contract and to return the heater was one thing; waiver of his right to recover damages for a breach of the warranty was quite a different thing. The right to sue on the warranty survived the acceptance of the apparatus."

In *Christensen* v. *Hamilton Realty Co.*, supra, it is held in effect that the owner of the building under the circumstances of that case, did not waive defects in the construction of the building by going into possession of the same, even though the contract expressly provided that occupancy of the building by the owner, his heirs, tenants, or assigns should be conclusive evidence of performance of the contract.

In *Leonard* v. *Hore Builders*, supra, the opinion of Mr. Justice Shaw, at page 65 of 174 Cal., at age 1151 of 161 Pac. (L. R. A. 1917C, 322) presents a clear statement of the rule:

"Where a contract is made with the owner of land to erect a building on the land, and there is a breach, by the contractor, of his covenant to build it in a good and workmanlike manner, neither the occupation of the house by the owner, after its supposed completion, nor the payment of the price, though accompanied by knowledge by the owner of the defective construction, is sufficient, taken alone, to operate as a waiver of the breach of the covenant. 'A right of action for damages is not necessarily waived by the mere fact of payment with knowledge of the defects or the taking possession of the subject-matter of the contract, but these facts

may be considered on the question of a waiver of this character' "—citing many cases.

See, also, *North Alaska Salmon Co. v. Hobbs, Wall & Co.*, 159 Cal. 380, 113 Pac. 870, 120 Pac. 27, 35 L. R. A. (N. S.) 501, and note at page 502, wherein it is said:

"An express warranty is a contract collateral to a contract of sale, although incident to and based thereon. Being collateral to the principal contract, it does not with that contract terminate upon delivery or acceptance of the subject-matter of the sale by the purchaser, but it survives such acceptance, even as to defects in the property then known to the purchaser, to the extent that a breach of the warranty may be relied upon in recoupment of damages or counterclaim to an action for the purchase price, or as furnishing an independent action for damages for the breach."

It is not necessary to review the cases further. The court is satisfied that under the law appellant did not waive its right of action for breach of the warranties contained in the contract merely by accepting and paying for the elevators with knowledge of their defects and noncompliance with the contract. We have seen fit to treat this question as one of law, whereas in fact at the time the motion was made it was clearly a question for the jury. The tendency of practically all evidence for the plaintiff, including that of persons representing the plaintiff, was to the effect that at the time of acceptance and payment they believed the elevators as accepted by the architect were a substantial compliance with the contract. The jury, however, by special findings, having found that plaintiff had knowledge of the defects complained of before acceptance and payment, I have assumed in this discussion to dispose of the matter as a question of law at this stage of the opinion.

It is next contended by defendant that the stipulation of the contract, especially subdivision XII was as much for defendant's protection and indemnity as it was for the contractor or owner; that it raised an equity in the surety company in the fund created by it and to be retained under it; that the disregard of such stipulation by the building company and plaintiff operated to discharge and did discharge and release the defendant surety company.

Subdivision XII was quoted in the early stages of this opin-

ion, but, as defendant contends that its provisions are conclusive of defendant's right to recover, it becomes of sufficient importance to reproduce it in this connection:

"XII.  The contractor agrees that if the subcontractor shall well and faithfully fulfill this contract to the satisfaction of said architect, and keep every covenant on its part herein contained, then the contractor will pay to the subcontractor the sum of thirty thousand dollars ($30,000.00) for all this work and material in place complete and accepted by the architect under this contract.

"No payment made under this contract shall operate as an admission, on the part of the contractor or the architect, that this contract, or any part thereof, has been complied with, in case the fact shall be otherwise, or so as to preclude any action for damages against the subcontractor, should the work and materials hereby required not be performed and furnished in a substantial and workmanlike manner, and of proper quality, or should this contract not be faithfully executed in every respect, or should the work so furnished and installed by the said subcontractor not meet with the written acceptance and approval of the architect."

The subdivision is divided for convenience into two paragraphs.  The first, standing alone, might support the contention of defendant if we apply to it the rule *strictissimi juris* in favor of defendant.  When, however, the two paragraphs are read and construed together we do not see how defendant's contention can be sustained even if the rule *strictissimi juris* is applied.  Briefly stated, when the two paragraphs are read and construed together, the meaning of the language seems to be that the elevator company could not enforce payment until the work is completed to the satisfaction of the architect and according to the contract.  If, however, payment should be made and the work or material proved to be substantially defective and not according to the contract, such payment should not be taken as an admission that the contract had been complied with, if the fact is otherwise, nor should such condition preclude an action for damages.

By no rule of construction can we give to subdivision XII the effect contended for by defendant, without entirely disregarding the last paragraph of the subdivision.    **14** Defendant's contention seems to be that any payment made by the building company or the plaintiff would be made at its peril unless the contract was fully performed.  That

appears to be the very contention against which the last paragraph was intended to protect the plaintiff. As far as the language of the subdivision on its face is concerned, it seems to have been incorporated into the contract for the protection of the building company or the plaintiff, and not for the protection of the surety.

Defendant, however, makes the point that the building company in the fall of 1914 tried to obtain the consent of defendant to the making of a payment on the work, but defendant refused to consent. Plaintiff and the building company, as defendant contends, afterwards, without the knowledge or consent of defendant, paid for the work although it was no more complete than when the defendant refused its consent. It is strongly urged by defendant that in seeking defendant's consent to the making of a payment on the work plaintiff and the building company construed the provisions of subdivision XII the same as defendant now contends; that is, that the defendant had a substantial right in having payment withheld and the money retained until the contract was fully performed. Assuming that our interpretation of the provisions of subdivision XII is correct, in that it safeguards plaintiff as to payments made before the contract is fully performed, the question arises did plaintiff lose the benefit of this safeguard merely because at some stage of the work the building company sought defendant's consent to the making of a payment on the work? We do not think that such contention can be successfully made. In the fall of 1914 the elevator company was insisting that the contract had been performed and was clamoring to be paid. The building company and plaintiff were willing to pay and applied to defendant for its consent. Defendant refused. The elevator company still clamoring for payment and threatening to remove the elevators, the building company and plaintiff concluded to accept the elevators and pay the price, evidently relying on the contract for their justification. After all, it is a matter to be settled and determined by the contract itself, rather than by some conduct of the plaintiff of building company, which in no manner misled the defendant

to its prejudice as to any contractual right. The right of plaintiff or the building company to pay for the work without jeopardizing its cause of action, even though the contract was not strictly complied with, being preserved and safeguarded by plain and unambiguous language, there appears to be no room for construction.

The cases relied on by defendant are as follows: *Prairie State Bank* v. *United States,* 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412; *Gen. Steam. Navigation Co.* v. *Rolt,* 6 C. B. N. S. 550; *United States* v. *American Bonding & T. Co.,* 89 Fed. 925, 32 C. C. A. 420; *County of Glenn* v. *Jones,* 146 Cal. 518, 80 Pac. 695, 2 Ann. Cas. 784; *Hubbard* v. *Reilley,* 115 Ind. App. 19, 98 N. E. 886. They are each and all distinguished from the case at bar in several particulars and especially in respect to the matter of preserving a right of action notwithstanding payment in advance. Appellant, however, insists there was no advance payment, but, even if there was, such payment was not prohibited by the contract. *Litchigi* v. *Gottlieb,* 124 Mo. App. 237, 113 S. W. 1134. See, also *Y. M. C. A. et al* v. *Ritter,* 90 Kan. 332, 133 Pac. 894, L. R. A. 1915C, 170; *School Dist.* v. *De Lano,* 96 Kan. 499, 152 Pac. 668.

It is further contended by defendant under this subhead that "the Van Emon Elevator Company, as shown by the evidence, long prior to the institution of suit by the plaintiff, became insolvent and went out of business." It is not shown, even if it were material, that plaintiff or the building company was aware of the elevator company's insolvency at the time plaintiff made the final payment. There can be no presumption that plaintiff knew it, even if we construe the transaction strictly in defendant's favor. Defendant's relation towards its principal, the elevator company, was certainly such as to enable it to know as well as the plaintiff the financial condition of the elevator company. Indeed it was to the interest of defendant from the very moment it executed the bond insuring the faithful performance of the contract to know the financial condition of its principal and keep informed in that regard throughout the continuance of the work. Furthermore, it was to its interest to

see that its principal performed its contract according to the terms thereof. We do not see how defendant can consistently contend that plaintiff should have kept it informed. *Town of Wakefield* v. *American Surety Co.*, 209 Mass. 173, 95 N. E. 350.

The next and last contention of defendant in support of its motion for a directed verdict, the denial of which is assigned as error, is that the plaintiff and the elevator company, in September, 1914, and January, 1915, entered into contracts with each other whereby they attempted to change, vary, alter and modify the terms of the original elevator contract without the consent, knowledge, or approval of the defendant surety company and, among other things, covenanted and agreed that the period of supervision provided in paragraph XXII of the contract should be increased from 90 days to a period of one year.

We are somewhat confused concerning the subject-matter of this contention. It is not at all clear to us that any changes or alterations were actually made in the original contract, although some were proposed but not executed because defendant refused its consent. In any event it seems to us that this question is likewise settled and determined by the very terms of the contract itself. Subdivision IV of the contract, heretofore quoted, is as follows:

"The contractor may at any time during the progress of the work require any deviation from, addition to, or omission in the specifications and plans, without giving notice to the surety, and the subcontractor agrees to make such changes as a part of this contract, and such change or changes shall in no manner impair, affect, or avoid this agreement, and this clause shall be construed without any limitations or restrictions whatsoever as to extent or character of such changes, omissions, or additions. * * *"

This is remarkably strong language and far-reaching in its effects. Defendant must have fully understood and comprehended the force and effect of this provision, for on December 9, 1914, in a letter written to plaintiff by H. R. Zevely, vice president of the defendant surety company, the writer, referring to the right to make changes and alterations in the original contract, says:

"It is specified in the bond that: 'Any deviations from, additions to, or omissions in, the contract, specifications, or plans of work required by the said James Stewart & Co., may be made from time to time, during the progress of the work, and as often as required, and such change or changes may be made without the consent or knowledge of the surety, and without in any wise releasing them or any of them from liability under this present bond.' "

In the face of this provision of the contract and defendant's express recognition of its effect, it is somewhat difficult to see how this question can be raised by defendant, even if changes and alterations were made. Besides this, as we read the record, there is neither allegation nor proof as to any injury to defendant on account of the alleged changes and alterations. This being true, under modern authorities relating to paid sureties, there are no grounds for complaint. *Beebe* v. *Redward*, 35 Wash. 615, 77 Pac. 1052, heretofore referred to.

In the note, 12 A. L. R. supra, at page 389, it is said:

"While an individual surety's contract must be strictly construed in his favor, that of a surety company, given for the faithful performance of a building contract, will not be construed so as to release it because of a variance in the performance of the contract, unless it is shown that the variance substantially increased the chances of loss insured against"—citing many cases.

If such is the rule in cases where the contract does not authorize a change, it certainly ought to be the rule in a case like the one at bar, where the authority to make changes is expressly given in unmistakable terms.

We have now considered every material question raised by defendant's motion for a directed verdict, and have arrived at the conclusion that the trial court committed no error in denying the motion. This conclusion practically disposes of the entire case, for the discussion already had covers and determines appellant's principal assignments of error.

The court in numerous instructions in effect instructed the jury that plaintiff was not entitled to recover if it or the building company, at the time the elevators were accepted and paid for, knew that they were substantially defective and not in compliance with the contract. These instructions were excepted to by the plaintiff and are relied on for re-

versal of the judgment. The trial court also refused numerous requests of plaintiff for instructions to the jury to the effect that if the contract was breached by defendant, as alleged in plaintiff's complaint, plaintiff was entitled to recover, notwithstanding it or the building company at the time of acceptance and final payment, knew that the elevators were defective and not in substantial compliance with the contract. The refusal of the court to so instruct the jury is also relied on for a reversal of the judgment.

These are the principal errors urged by appellant, and, as appears in the discussion of defendant's cross-assignment of errors and the conclusions reached by the court, we have already determined the main questions upon which appellant relies. It follows that the judgment of the trial court in any event must be reversed. It remains to be determined whether or not appellant as matter of law is entitled to an order directing judgment to be entered for appellant in accordance with its contention.

This is an action at law, and the court is without power to direct a verdict if there is any question of fact that should be determined by the trial court.

As stated near the beginning of this opinion, the breaches of the contract were admitted by defendant and also plaintiff's damage to the full extent alleged in the complaint, to wit, in the sum of $30,000. It was also stipulated that if plaintiff recovered judgment it should be for that amount and interest thereon from the 1st day of April, 1917. With this admission and stipulation, under the pleadings there was no issue of fact submitted to the jury except the question of plaintiff's knowledge that the contract had not been performed when it made the final payment. We have held that such issue was immaterial. Affirmative issues raised by defendant's answer have been determined as questions of law. In view of the conclusions reached by the court, there appears to be no question of fact to be tried by the court below.

The judgment of the trial court is therefore vacated, and the cause remanded, with directions to the trial court to enter

judgment for the plaintiff for the sum of $30,000 with interest thereon from April 1, 1917. Costs to be taxed against respondent.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK, JJ., concur.

On Application for Rehearing.

THURMAN, J. Respondent assumes in its application and brief for a rehearing that the court was wrong on practically every question it attempted to decide. This is a sweeping indictment and were it not for the fact that it has almost become a customary proceeding, on the part of litigants against whom a case has been decided, to charge wholesale error on the part of the court, we would probably regard the charge in the instant case with deeper concern. The writer of the opinion, however, is not offended because of the drastic criticism applied to the opinion, for after more than 30 years of active practice in the courts of Utah before his elevation to the Supreme Bench, he does not now recall a single case decided against him by this court in which, on the first impulse, he did not conscientiously believe the court was wrong.

This has been a difficult case and in many of its aspects exceedingly interesting. It would not be strange or unusual in a case of such magnitude, involving as it does conditions without precedent and questions never before adjudicated, if the court on one or more of the questions involved should misconceive the law and arrive at an erroneous conclusion. The court makes no claim to infallibility. We gave to this case careful and unbiased consideration, as we endeavor to do in every case we are called upon to decide.

The first objection urged by respondent is that the court erred in holding that the release and discharge of the building company by the plaintiff did not operate to destroy whatever cause of action plaintiff may have had in its own right. This objection, in the opinion of the writer, is founded upon a misconception of the real grounds upon which the decision was based. In contradistinction to the doctrine of a debtor-creditor relationship, for which respondent contended and

still contends, we based our opinion upon the doctrine announced in Elliott on Contracts, § 1413, a portion of which counsel for respondent quoted in their original brief. There being no marks nor signs indicating an omission, we copied the matter from counsel's brief instead of from the author's work. An omission was made not vitally material in the instant case, but in justice to the author we deem it our duty to substitute his language for that which appears in the opinion, italicizing the words omitted, and thereby correct our mistake:

"It is a rule of practically universal application that there must exist on the part of the original parties to the contract a clear intent to benefit the third party, *although a majority of the courts do not go so far as to hold with Connecticut that the contract must be for the sole and exclusive benefit of the third party.* Many of the cases, in addition to holding that there must be an intent to benefit the third party, place a further limitation on the rule to the effect that the promisee must owe some obligation to the third party."

After a careful consideration of the contracts and bond, the nature of the case and relationship of the parties, the court was driven to the conclusion that there existed a clear intent to benefit plaintiff, thus bringing the case squarely within the doctrine enunciated in the first sentence of the above quotation. An unbiased reading of the opinion will demonstrate that that was the ground upon which the court disposed of the third party question. In other words, the court concluded that the plaintiff had a cause of action it its own right because of the manifest intent of the parties to directly benefit the plaintiff. Besides this, we endeavored to make it clear in the opinion that, as to some of the warranties mentioned in the contract, the plaintiff not only had a right of action in its own name but it had the sole and exclusive right. There is no merit in respondent's first objection.

The next objection is that the court erred in holding that plaintiff was not estopped from contending that its knowledge of defects in the elevators was immaterial after alleging in its complaint that it, in good faith, believed the terms of the contract had been complied with. This objection, as it is

stated in the brief, is somewhat involved and our interpretation of counsel's meaning may be incorrect. In any event, the contention is that the court was wrong in holding that plaintiff was not estopped. Counsel rely on *Morrison* v. *Atkinson*, 16 Okl. 571, 85 Pac. 472, 8 Ann. Cas. pp. 487, 488, and *Lebcher* v. *Lambert*, 23 Utah, 1, 63 Pac. 628.

In *Lebcher* v. *Lambert*, supra, appellant objected to certain evidence offered by the adverse party in the court below. The court sustained the objection and the evidence was excluded. In this court appellant assigned as error the failure to prove the very facts which the excluded evidence would have tended to prove. This court held that appellant was estopped.

We are somewhat surprised that this case shonld be cited as a parallel case and insisted upon as controlling in the case at bar. The question here is controlled by the doctrine announced in *Lindsay Land & Live Stock Co.* v. *Smart Land & Live Stock Co.*, 43 Utah, 554, 137 Pac. 837, a case cited by appellant. Without reviewing the case at length it is sufficient to say that plaintiff alleged more in his complaint than was necessary to prove. Mr. Justice Frick, speaking for the court at page 560 of 43 Utah, at page 840 of 137 Pac., says:

"The case, therefore, is one where the complaint alleged more than the plaintiff was required to prove in order to recover. This is often the case, and where, as in the case at bar, the allegation does not relate to a matter of description; that is, to matters of identity, but refers to matters of substance, it is not necessary to prove more than the law requires, although more is alleged. This is elementary doctrine, and needs no citation of authorities. The court, therefore, did not err in omitting the word 'willfully' from the charge."

We have not deemed it necessary to review the cases cited in 8 Ann. Cas., supra. We have no doubt that such as support respondent's contention are founded on reasons similar to those controlling in the *Lebcher-Lambert* Case, supra, and, if so, they are not controlling in the instant case.

The third objection, while deficient in clarity, seems to be a criticism of the opinion for applying the rule of liberal construction to matters other than provisions of the contract.

To be more specific, counsel complain that the court applied the rule to the question of plaintiff's knowledge of defects at the time it made the final payment.

Again we are forced to conclude that counsel misconceive the scope and meaning of the opinion. Not only that: They seem to either misunderstand, or entirely disregard, the logic of their own position in the case. The very contention they make in the case, that knowledge of defects in the elevators at the time of payment therefor by the plaintiff operated as a discharge of the surety, implies on its face that counsel are attempting to apply the rule *strictissimi juris* in favor of the surety. There is no provision in the contract which says or even implies that knowledge of defects at the time of payment operates to discharge the surety unless we apply thereto the rule in favor of gratuitous sureties. Whence comes the assumption that the surety should be discharged if plaintiff paid with knowledge that the contract had not been performed? The truth seems to be that surety companies have become so accustomed to regarding themselves as favorites of the law that they instinctively construe every ambiguous or doubtful provision in their own favor, without realizing that they are applying rules of construction. If the contract nowhere forbids payment for the elevators because plaintiff has knowledge of defects therein, then, in our opinion, under the rule applicable to paid sureties the surety company has no right to read into the contract an assumption that payment with such knowledge operates as a discharge of the surety.

Much is said in respondent's brief concerning the question of good faith and the special finding of the jury that plain-. tiff did not in good faith believe that the contract had been performed. This finding of the jury was set aside by the trial court as not sustained by the evidence. The opinion is criticized for ignoring this feature as if it were a controlling question in the case. The truth is, when we assumed without question that plaintiff had knowledge of defects in the elevators when it made the final payment therefor, we assumed every possible fact necessary to a fair and candid discussion of the legal· question involved. We assumed that plaintiff

had knowledge and held that knowledge was immaterial under the peculiar facts of the case. This proposition is supported in the opinion by abundant authority.

The fourth objection is to our interpretation of subdivision XII of the contract. Respondent's contention is that subdivision XII created a fund in which the surety company had an equity, and that payment of the purchase price prior to substantial performance of the contract operated to discharge the surety. Our view of the case is that it was neither so expressed nor implied in the contract. It is quite common in this class of cases for a surety company to expressly provide that all or a certain percentage of the purchase price should be retained until the contract is fully performed. There is no such provision in either the elevator contract or bond in the instant case. On the contrary, it is expressly provided that—

"No payment made under the contract shall operate as an admission on the part of the contractor or the architect that this contract or any part thereof has been complied with *in case the facts shall be otherwise*, or so as to preclude any action for damages against the subcontractor, should the work and materials hereby required not be performed and furnished in a substantial and workmanlike manner, and of proper quality, or should this contract not be faithfully executed in every respect," etc. (Italics ours.)

In our interpretation of this portion of subdivision XII we used the following language:

"If, however, payment should be made and the work or material proved to be substantially defective and not according to the contract, such payment should not be taken as an admission that the contract had been complied with if the fact is otherwise; nor should such condition preclude an action for damages."

Counsel for respondent make the most of the inapt expression of the court and attempt to turn the words "proved to be" as meaning "discovered after payment was made." This seems to be "grasping at straws" and is hardly fair to the court. Lest others, hypercritically inclined, should in the future attempt to distort the meaning of the court as to the language above quoted the opinion will be modified by substituting the following which, in our judgment, more accurately reflects the meaning of the contract:

"If, however, payment shall be made and the work or material is substantially defective and not according to the contract, such payment shall not be taken as an admission that the contract has been complied with, nor shall such condition preclude an action for damages."

With the above modification we have but little further to add to what is said in the opinion respecting the meaning of subdivision XII. Inasmuch as the contract does not say, either expressly or by implication, that the money shall be withheld until the contract is substantially performed, and inasmuch as the contract further provides, in effect, that payment without substantial performance shall not preclude an action for damages, it is difficult to see the force of respondent's contention, unless we apply the rule *strictissimi juris* in favor of the surety.

The fifth contention is that the court erred in holding that the surety company is not discharged by alterations made in the contract without its consent, by plaintiff and the elevator company, in respect to matters for which respondent furnished the bond. Nothing new is offered under this objection, consequently the matter may well stand as we left it in the opinion. This much, however, may be said in addition: This action was brought to recover damages for breaches of the contract originally entered into and executed by the parties. Not a single demand is made against the surety company on account of changes or alterations, if there were any, and no extra burden is attempted to be imposed upon respondent because of the alleged changes or alterations. If there were changes or alterations made in the contract they were entirely disregarded by plaintiff in bringing its action. All it claims or demands is just what it is entitled to under the original contract as executed by the parties.

But it is contended by respondent that the liberal rule of construction as applied to paid sureties, as adopted in the opinion, is at variance with decisions heretofore rendered by this court. The following cases are relied on: *Blyth-Fargo Co.* v. *Free et al.*, 46 Utah, 233, 148 Pac. 427; *Christensen et al.* v. *Hamilton Realty Co.*, 42 Utah, 70, 129 Pac. 412; *Smith* v. *Bowman*, 32 Utah, 38, 88 Pac. 687, 9 L. R. A. (N. S.) 889;

*Daly* v. *Old,* 35 Utah, 79, 99 Pac. 460, 28 L. R. A. (N. S.) 463.

The decision in the *Blyth-Fargo* Case is the last expression of the court previous to the decision in the instant case. Counsel for respondent quote the following excerpt from the opinion at pages 240 and 241 of 46 Utah, at page 430 of 148 Pac.:

"Counsel contend that in.view that the appellant is engaged in the business of furnishing such bonds for profit, and for the reason that it determines upon the language and phraseology that is used therein, therefore such bonds are to be liberally construed in favor, of the beneficiary. A number of cases are cited in support of the contention. While some courts use the expression that bonds given under such circumstances are to be liberally construed in favor of the beneficiary, yet that is not precisely what the courts mean. The rules or canons of interpretation which are resorted to by the courts to aid them in arriving at the meaning or intention of any written document, instrument, contract, or statute, are precisely the same in every case."

If counsel had taken the trouble to move forward a few lines on the same page, they might have quoted the following language more to the point in the same opinion:

"Although a surety under such a bond is entitled to have the meaning and intention of the parties determined by the same rules that the meaning and intention of parties to other instruments are determined, yet in case of an ambiguity in the language used, or if a doubt arises by reason of the use of a particular term or phrase, the doubt may be, and usually is, resolved against the surety for profit, whereas it may be, and usually is, otherwise as against a voluntary surety."

This is the rule we have attempted to announce in the case at bar. As before stated, it is the last expression of the court prior to the instant case, and as shown in the opinion is supported by the overwhelming preponderance of judicial opinion in nearly every jurisdiction of the country. Even counsel for respondent, to their credit be it said, have not the temerity to contend that the rule announced by Mr. Justice Frick in the excerpt last quoted is not the prevailing doctrine in both the federal and state jurisdictions of the United States.

It is not necessary to review the former decisions of the court referred to by counsel. If they are not in harmony

with the last expression of the court, they are by implication overruled. But in fairness to counsel it is our duty to say their contention is that there is no ambiguity in the contract between the parties and therefore no reason for resorting to the rule in question. There is, in our opinion, a conclusive answer to this contention. The very fact that counsel disagree with the members of this court as to what the contract means concerning the substantial rights of the parties implies the existence of ambiguity and uncertainty in the contract. Because of the ambiguity and uncertainty there arises a doubt as to what the parties intended. The court applied the rule in question in order to solve the doubt.

This disposes of all the objections raised by respondent which the court, from any point of view, considers material. We might with propriety have summarily disposed of many of the objections for the reason that the argument offered in their support was, in substance, merely a repetition of the argument made in the original brief. But because of the novelty as well as the importance of many of the questions involved, and the apparent earnestness of counsel in their insistence that the court has grievously erred, we have devoted more time and attention to the objections urged than we otherwise would have done, especially in view of the extraordinary length of the original opinion.

We cannot, in justice to ourselves, conclude this opinion without referring to the fact that respondent's counsel in arguing the questions involved have assumed a self-opinionated attitude wholly incompatible with a calm dispassionate discussion of new and doubtful questions. If the court were not disposed to make liberal allowance for the zeal of counsel and cover their extravaganzas with the mantle of charity, some of the expressions used might be deemed offensive. The concluding paragraph of their brief, which we publish herewith, is a fair sample of their attitude toward the opinion of the court:

"The business of suretyship is a legitimate pursuit. It is recognized as such by law. It is a misfortune that it should be struck down as, by the recognition of appellant's doctrines, it is struck down in this decision. That sureties cannot continue in business if

creditors and principals need not deal with them in good faith, if they are to be deprived of the benefit of. the fund doctrine, and if their contracts are to be altered without their consent, is clear. But the consequences of this decision reach far beyond the single business of suretyship. The decision refuses to carry the law of strangers' suits on contracts to its logical end, and has thus left that law in doubt. It has held knowledge and good faith in respect to the rights of third parties immaterial. It has made trial court issues of no consequence on appeal. It has threatened the right of trial by jury. It has transcended the law of contracts. All of the business of men and courts is vitally affected by this decision."

Under the decision rendered in this case, surety companies have the right to make such reservations and fix such limitations as they may deem necessary for their safety and protection. This proposition has been affirmed by practically every decision heretofore rendered by this court relating to the rights and obligations of sureties. If they fail to adopt such precautions, either through their neglect or a fear of driving business away, it is not within the just power of judicial tribunals to afford them relief. If they cannot do business under the law as interpreted in practically every jurisdiction of the country it will be unfortunate for them but irremediable by the courts. As regards the direful consequences which will befall business in general, pessimistically foreshadowed by respondent's counsel, the court sees no occasion for alarm. It believes that the business of the country will not be disturbed or thrown into confusion because of our opinion, but will move on the same as heretofore.

We see no reason for modifying our opinion except as hereinbefore set forth.

The application for a rehearing is denied.

CORFMAN, C. J., and WEBER, and FRICK, JJ., concur.

GIDEON, J. (concurring in part). I have no difficulty in agreeing with the reasoning and conclusions of Mr. Justice THURMAN on the questions discussed in the opinion of the court except the construction of subsection XII of the contract with the elevator company. At the time of concurring in the original opinion I had grave doubt respecting the views of the court on that controverted question. I expressed that

doubt to the writer of the opinion at that time. The question has been again ably reargued in the petition for rehearing. I am now convinced that the judgment of the court as rendered should be modified.

In this brief memorandum I shall assume that the jury's verdict is conclusive of the question of fact that the defect in the elevators was known at the time of making the last payment to the elevator company. Payment with knowledge on the part of the appellant of a defective elevator is in and of itself failure to act in good faith toward the surety. By so doing the appellant lost the fund necessarily set aside by it for the installation of elevators in its building. The surety company was entitled to have that fund preserved so that the same could be applied in installing such elevators as the contract called for. It is an elementary and fundamental principle in the construction of contracts that courts, in the absence of a contrary showing, will construe the language of such contracts upon the assumption and theory that the contracting parties had intended to deal in good faith. The terms of the contract and the language employed are presumed to be used with that understanding, not only in determining the rights of the immediate parties to a contract, but in determining the rights of other parties entitled to the benefits of a contract. Whatever rule of construction may be controlling against the surety, whether it be the so-called liberal rule as against paid sureties, or the strict rule of construction in favor of voluntary sureties, there exists over and above and controlling this rule the further and primary rule that the intent of the contracting parties be ascertained and enforced.

This intent should, of course, be determined if possible from the language found in the contract. If not, resort is had to the subject-matter under consideration and the relationship of the parties. No rule of construction can alter the fact that the relationship of the parties in this action is that of surety and beneficiary. Construing the contract in the light of that relationship, by these general rules can it be rationally held that the surety understood or contemplated it

was obligating itself to a liability in the absence of good faith on the part of the beneficiary? The very terms of that subdivision, in my judgment, negative any such conclusion. Admittedly the language of the subsection does not compel the construction given it by the court. However plausible the reasoning invoked to support the construction claimed for the contract, its unsoundness is demonstrated by the injustice which the result imposes on the surety company. The nature of the subject-matter of contract and the relationship of the parties are conclusive that it could never have been within the contemplation of the surety company that the appellant had the right to accept a known defective elevator, pay the full contract price therefor, and then demand full liability on the bond. The appellant, realty company, was entitled to have elevators placed in its building that would measure up to the standard specified in the contract with the elevator company and for the amount named in the contract with the elevator company. The surety was obligated to see that the contract was complied with, assuming that the beneficiary under the contract would act in good faith. The surety was bound for the fulfillment of this contract for the full amount of the penalty of the bond, to wit, $30,000. It was not released from that obligation by any act upon the part of the realty company, but it was released pro tanto, in my judgment, for any amounts paid to the elevator company for defective appliances within the knowledge of the appellant at the time of making payment. There is no reason for granting a rehearing in this case. In my judgment, however, the judgment of the court should be modified, and the case remanded to the district court with directions to determine, by additional proof if necessary, the actual damages sustained by appellant by reason of the defective elevators, to credit upon that amount the $20,000 wrongfully paid to the elevator company, and to enter judgment against the surety company for whatever balance may be thus ascertained, provided such balance is not greater than the liability stipulated in the bond.