**Robert S. FREDERICKSEN, aka Robert S. Fredericksen, Plaintiff and Appellant,**

v.

**KNIGHT LAND CORPORATION, a Corporation, and James L. Knight, Defendants and Respondents.**

**No. 18131.**

Supreme Court of Utah.

June 29, 1983.

Robert F. Orton and T. Richard Davis, Salt Lake City, for plaintiff and appellant.

Edward W. Clyde and Ted Boyer, Salt Lake City, for defendants and respondents.

DURHAM, Justice:

This appeal involves a breach of contract action brought by the appellant Robert S. Fredericksen against the respondent Knight Land Corporation (hereafter "Knight").[1] Knight asserted the six-year statute of limitations as an affirmative defense. *See* U.S.C., 1953, §§ 78–12–1 & –23(2). The trial court entered a judgment of "no cause of action" based on the six-year statute of limitations. We affirm.

The parties to this action submitted this case to the trial court on stipulated facts, which are as follows:

On November 1, 1961, Knight executed an agreement (hereafter the "ESLIC contract") with East Salt Lake Investment Company (hereafter "ESLIC") to purchase 16,500 acres of land, known as the Jeremy Ranch, which is located in Summit, Salt Lake, and Morgan Counties, Utah. Under the terms of the ESLIC contract, Knight agreed to make an initial payment of $60,-000 and a down payment of $120,000.

---

1. By stipulation, the parties dismissed the cause of action against the defendant James L. Knight.

Knight also agreed to make an annual payment of $160,000, in exchange for which ESLIC agreed to release and convey a specific portion of the Jeremy Ranch land with each annual payment.

In the fall of 1961, Knight contracted to sell 5,000 of the 16,500 acres to Huntington Park Investment Company (hereafter "Huntington Park"), a limited partnership, of which Fredericksen was a limited partner. Huntington Park made an initial payment of $120,000, which Knight used to make the $120,000 down payment to ESLIC. A dispute arose between Knight and Huntington Park, including Fredericksen (hereafter the "claimants"), individually sought a refund of their investment from Knight. Fredericksen's investment was $10,000. On December 31, 1963, Knight and the claimants executed an agreement in settlement of their claims (hereafter the "1963 contract").

The 1963 contract provided that Knight would pay an escrow agent for the claimants fifty percent of the gross profits actually realized by Knight from the resale of lands acquired by Knight under the ESLIC contract. The contract defined "gross profits" as "[a]ll sums received by Knight from the resale of any of the Jeremy Ranch land in excess of $85 per acre ...." The 1963 contract also provided that if Knight did not fully reimburse the claimants for all sums advanced, plus ten percent, by July 1, 1968, each of the claimants had the option of either (1) requesting Knight to convey acreage of the Jeremy Ranch previously released to Knight by ESLIC at the rate of $85 per acre sufficient to fully satisfy and discharge the outstanding balance owed to the requesting party, or (2) continuing to receive a pro rata share of the gross profits until full reimbursement was received for sums advanced, plus ten percent. Under the option, no requests were ever made, no money was ever paid, and no land was ever transferred to any of the claimants.

In order to make each of the annual payments required by the ESLIC contract, Knight, prior to each payment date, arranged for the sale of the land to be re-

leased by ESLIC. An escrow arrangement was set up so that the deeds to the land scheduled for release and the money from the purchaser(s) of that land were placed in escrow. The escrow agent was then directed, after deducting various costs, to release all of the money to ESLIC and transfer the deeds to the released lands to the purchaser(s). None of the proceeds were paid directly to, or retained by, Knight. Each sale was at a price substantially in excess of $85 per acre, but none of the monies in excess of $85 per acre were paid to the claimants.

In May of 1970, Knight negotiated a sale of all of the remaining approximately 12,500 acres to Emigration Land Company (hereafter "Emigration"). Pursuant to the sale agreement, Emigration made a $500,000 down payment, which Knight used to discharge various judgment liens. The trial court found that this sale generated $245,000 in gross profits as defined by the 1963 contract. However, none of the gross profits were paid to the claimants as required by the 1963 contract. Knight also received a $75,000 payment from Emigration in both April of 1971 and April of 1972. In addition, in 1973, in order to induce prepayment in full by Emigration, Knight accepted the discounted amount of $850,000 as a payoff on the contract.

In January of 1970, three of the claimants filed suit against Knight. In November of 1970, one of the claimants reached a settlement agreement with Knight and, in June of 1974, the other two claimants also reached a settlement agreement with Knight.

On February 7, 1978, Fredericksen served a letter on Knight, demanding that Knight perform its obligations under the 1963 contract. On March 20, 1978, Fredericksen filed this suit against Knight, requesting conveyance of property or, in the alternative, repayment of his $10,000, plus 10 percent. The parties submitted the case to the trial court on the above stipulated facts, accompanied by various memoranda of law.

The trial court found that each sale by Knight of the released land in order to raise the monies necessary for the annual pay-

ment to ESLIC "was at a price substantially in excess of $85.00 per acre and there were thus gross profits realized on each of said sales within the meaning of the 1963 contract . . . ." With respect to fifty percent of the gross profits realized from the sales of the released lands, the trial court found that:

[N]one of said gross profits was paid to [Fredericksen] as was required by the terms of said 1963 contract. The failure to make such payments was a breach of said [1963] contract and the first breach occurred with the resale of the tract of land secured with the November 1963 payment. Subsequent breaches occurred with each sale thereafter made until all of the remaining land was sold in May of 1970. In May of 1970, when all of the remaining lands were sold, the sale also generated gross profits [in the amount of $245,000, well] in excess of $85 per acre as defined in the 1963 contract on which this action is based, and none of said proceeds were paid to the escrow holder for the use and benefit of [Fredericksen], and said failure was also a breach of the contract.

The trial court also found that:

15. The right of [Fredericksen] under the 1963 contract to select land "therefore released" matured on the 1st day of July, 1968. The contract does not specifiy [sic] a specific time within which the option to take land must be exercised and the court finds, therefore, that the option to select land could be exercised within a reasonable time after that date, and that a reasonable time had expired prior to the time [Fredericksen] undertook to exercise the option on the 6th day of February, 1978.

16. Any obligation [Knight] may have had to permit [Fredericksen] to select land from the lands "theretofore released" was breached when in May of 1970, [Knight] sold all of the remaining land, thus making it impossible for [Knight] to honor any such obligation. Said sale in May of 1970 occurred more than six years before this action was filed.

Based on these findings, the trial court held that Fredericksen's cause of action was barred by the six-year statute of limitations and "awarded Judgment of 'no cause of action' against [Fredericksen] on all causes of action set forth in [Fredericksen's] Complaint." Fredericksen now appeals that decision, claiming that the trial court erred in holding that his causes of action were barred by the six-year statute of limitations.

■ The applicable statute of limitations provides that an action based on a written contract must be commenced within six years after the cause of action has accrued. *See* U.C.A., 1953, §§ 78–12–1 & –23(2). The statute of limitations begins to run at the moment that a cause of action arises. *See, e.g., Ash v. State,* Utah, 572 P.2d 1374 (1977); *Kimball v. McCornick,* 70 Utah 189, 259 P. 313 (1927). "Ordinarily, a cause of action for a debt begins to run when the debt is due and payable because at that time an action can be maintained to enforce it." *O'Hair v. Kounalis,* 23 Utah 2d 355, 357, 463 P.2d 799, 800 (1970) (quoting *State Tax Commission v. Spanish Fork,* 99 Utah 177, 182, 100 P.2d 575, 577 (1940)). *See also M.H. Walker Realty Co. v. American Surety Co.,* 60 Utah 435, 211 P. 998 (1922) (stating that in a breach of contract action the statute of limitations ordinarily begins to run when the breach occurs).

The question to be determined on this appeal is whether a cause of action accrued against Knight six years or more prior to Fredericksen's commencement of this action on March 20, 1978. The critical date is therefore March 20, 1972. The 1963 contract defines "gross profits" as "[a]ll sums received by Knight from resale of any of the Jeremy Ranch land in excess of $85.00 per acre . . . ." The 1963 contract also mandates that Knight pay fifty percent of the gross profits to an escrow agent for the claimants. From 1963 through 1968, Knight made arrangements to raise the money necessary to make its annual payment to ESLIC by arranging to sell the land to be released. The parties stipulated

that on each such sale "the sale price was always more than $85 per acre." The trial court found that "gross profits were realized [by Knight] on each of said sales within the meaning of the 1963 contract. . . ." On appeal, Fredericksen argues that Knight did not receive "gross profits" on these resales within the meaning of the 1963 contract even though the sales price always exceeded $85 per acre because (1) Knight never actually received the cash but rather paid the entire amount to ESLIC pursuant to the ESLIC contract, and (2) Knight must first recoup its entire purchase price before any gross profits would be actually realized. We believe both of these arguments to be without merit. First, whether Knight actually took physical possession of the money from the land resales is irrelevant. The fact that the sales price on the released land exceeded $85 per acre renders the sale proceeds "gross profits" within the meaning of the 1963 contract. The mere fact that the monies were not physically received by Knight but rather were used to satisfy an obligation of Knight is immaterial. Second, the language of the 1963 contract does not support Fredericksen's argument that the parties contemplated that Knight would first recoup its entire purchase price before realizing any gross profits. Rather, the language of the 1963 contract shows that the parties contemplated that Knight would recoup its investment on a per acre basis. The 1963 contract specifies that the "cost of the land to Knight shall be considered to be $85.00 per acre, which is the average per acre price Knight has contracted to pay for the entire 16,500 acres." The 1963 contract defines gross profits as all sums received on resale in excess of $85 per acre. As evidenced by the terms of the contract, we hold that the contract's language demonstrates that the parties intended that Knight would recoup its investment on a per acre basis. *See, e.g., Morris v. Mountain States Tel. & Tel. Co.,* Utah, 658 P.2d 1199 (1983) (stating that interpretation of a contract is a question of law).

■ The trial court properly found that Knight received gross profits within the meaning of the 1963 contract on each of the sales it made to raise the monies necessary to make its annual payment to ESLIC. The parties also stipulated that none of the gross profits realized on the resales were paid to Fredericksen as required by the 1963 contract. The trial court found, and we agree, that Knight's failure to relinquish any of the gross profits constituted a breach of the 1963 contract. The question that now must be addressed is at what point in time did fifty percent of the gross profits realized by Knight total an amount sufficient to pay off the claimants as required by the 1963 contract. Fredericksen's cause of action for breach of contract fully matured on that date, and six years from that date is the point at which Fredericksen is forever barred from bringing suit to recover any of the monies owed.

During the period from 1963 through 1968, Knight generated the $960,000 necessary to make the six annual payments of $160,000 each by selling the lands released by ESLIC. In addition to the amounts generated by these sales, Knight received additional undisclosed sums which were paid to ESLIC on sales of acreage to the State of Utah Parks and Recreation Department and to W. Meeks Wirthlin. In exchange for all of these payments, ESLIC released approximately 4,000 acres of the Jeremy Ranch land. Even if we only considered the $960,000 known to be received for the 4,000 acres, Knight received an average price per acre of $240, or $155 gross profit per acre. The grand total of gross profits received by Knight for the 4,000 acres is approximately $620,000, fifty percent of which is well in excess of the $78,-500, plus ten percent thereof, owed by Knight to all of the claimants under the 1963 contract. Thus, Fredericksen's cause of action arose prior to 1969, which is well in excess of the six-year statute of limitations. We therefore hold that the trial court was correct in determining that Fredericksen's causes of action were barred by the six-year statute of limitations.

Fredericksen argues, however, that his cause of action based on the option to select land or continue to receive gross profits is

not barred. According to the language of the 1963 contract, the parties anticipated that the claimants would be fully reimbursed by July 1, 1968, or shortly thereafter. If the claimants were not completely paid off on July 1, 1968, they had the option of continuing to receive payments out of gross profits or requesting the conveyance of sufficient acreage of land at $85 per acre to discharge any outstanding balance. Fredericksen argues that, until formal demand has been made on Knight in exercise of the option, there would be no breach by Knight and thus the statute of limitations would not begin to run. We disagree and hold that, under either alternative of the option, Fredericksen's cause of action is barred.

It has been stated that:

Where a demand is necessary to start a limitation period running, a party is not permitted to postpone indefinitely or unreasonably, by failing to make demand, the time when the statute will begin to run, for by his laches he may be deemed to have perfected his right of action so as to start the running of the statute although he never actually made demand. Unless a delay in making a demand is expressly contemplated by the parties, the courts may presume from the lapse of an unreasonable time that a demand was made and refused.

51 Am.Jur.2d *Limitation of Actions* § 114 (1970) (citations omitted). The 1963 contract does not specify a time within which a claimant must exercise the option. "However, when a provision in a contract requires an act to be performed without specifying the time, the law implies that it is to be done within a reasonable time under the circumstances; and in case of controversy, that is something for the trial court to determine." *Bradford v. Alvey & Sons,* Utah, 621 P.2d 1240, 1242 (1980) (footnotes omitted). The trial court found that Fredericksen did not exercise the option within a reasonable time. We affirm that ruling and hold that a reasonable time within which Fredericksen should have exercised the option elapsed prior to March 20, 1972, and that the six-year statute of limitations began to run at the expiration of the rea-

sonable time. *See O'Hair v. Kounalis, supra.* Thus, Fredericksen's claim is barred by the six-year statute of limitations.

Fredericksen also argues that the six-year statute of limitations was tolled by Knight's settlement with the other three claimants in 1970 and in 1974. Fredericksen cites several cases in support of his argument. *See, e.g., Dixon v. Bartlett,* 176 Cal. 572, 169 P. 236 (1917); *McKennon v. McKennon,* 104 Okl. 228, 231 P. 91 (1924). The cases relied on by Fredericksen are premised on the concept of partnership or joint obligation. If Fredericksen were in fact a joint obligee or a partner with the other three claimants, Fredericksen's argument might merit consideration. However, the 1963 contract provides that:

It is mutually acknowledged that the [claimants] are each acting on their own behalf, and that they are in no way associated one with the other. Payment will be made to each of the [claimants] for his own account, and if any one or more of them selects to take land, it will be conveyed to each of the parties, or his nominee, in their individual names, and no one of the [claimants] shall have any interest in the lands which are conveyed to any other one of the [claimants], it being mutually acknowledged that any association which may have existed between the [claimants] has heretofore been cancelled and terminated.

By the explicit terms of the contract, Fredericksen is not a joint obligee with the other three claimants. Thus, Fredericksen's argument regarding tolling of the six-year statute of limitations is without merit.

Fredericksen raises additional arguments which we deem to be without merit. Affirmed. No costs awarded.

HALL, C.J., and STEWART, OAKS and HOWE, JJ., concur.